**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　Plaintiff,<br>　　vs.<br>HEINZ GENTGES,<br>　　　　　Defendant. | No. 18 Civ. 7910 (KMK) |

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Richard J. Sapinski
Counsel for Heinz Gentges
Sills Cummis & Gross, P.C.
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: (973) 643-5975
Fax:  (973) 643-6500
Email:  rsapinski@sillscummis.com

ON THE BRIEF:
Richard J. Sapinski

**Table of Contents**

Page

PRELIMINARY STATEMENT .................................................................................1

FACTUAL BACKGROUND....................................................................................3

    I.    HEINZ PERSONAL HISTORY AND THE OPENING OF TWO SWISS ACCOUNTS ................................................................................................3

    II.    HEINZ U.S. TAX REPORTING............................................................4

    III.    HEINZ' 2001-2002 SIGNING OF NEW UBS OPENING AND OTHER FORMS RELATING TO THE PRE-EXISTING 4549 ACCOUNT AND THE 4377 ACCOUNT ...............................................................................7

    IV.    HEINZ USE OF HIS UBS ACCOUNTS ...............................................10

    V.    CLOSING OF THE UBS ACCOUNTS ..................................................13

    VI.    HEINZ VOLUNTARILY DISCLOSED HIS UBS INVOLVEMENT.................14

LEGAL ARGUMENT..........................................................................................17

    I.    STANDARD FOR SUMMARY JUDGMENT.......................................17

    II.    THE DISPUTED MATERIAL FACTS. ..................................................19

    III.    HEINZ DID NOT Willfully Fail to File a 2007 FBAR.........................23

    IV.    HEINZ DID NOT ACT OR RECKLESSLY WHEN HE FAILED TO FILE AN FBAR..................................................................................26

    V.    PORTIONS OF THE RECORDS UBS PROVIDED TO THE GOVERNMENT PURSUANT TO ITS DEFERRED PROSECUTION AGREEMENT HAVE NOT BEEN ESTABLISHED TO BE FOREIGN BUSINESS RECORDS ADMISSIBLE IN EVIDENCE UNDER FED R. EVID 803(6) AND/OR 902(11)/(12)....................................................31

    VI.    TO THE EXTENT IT IS TO BE IMPOSED, THE MAXIMUM WILLFUL FBAR PENALTY APPLICABLE TO the 4337 ACCOUNT FOR 2007 IS $100,000 .......................................................................33

CONCLUSION..................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

<u>Anderson v. Liberty Lobby, Inc.,</u>
  477 US. 242 (1986)................................................................................................17

<u>Borden Inc. v. Spoor Behrins Campbell & Young,</u>
  828 F. Supp. 216 (S.D.N.Y. 1993) ........................................................................17

<u>Celotex Corp. v. Catrett,</u>
  477 U.S. 317 (1986)...............................................................................................17

<u>Curry v. City of Syracuse,</u>
  316 F.3d 324 (2d Cir. 2003)...................................................................................18

<u>Huminski v. Corsones,</u>
  396 F.3d 53 (2d Cir. 2005).....................................................................................17

<u>Kimble v. United States,</u>
  141 F.3d 373 (Ct. Cl. 2018) .............................................................................23, 29

<u>Lefcourt v. United States,</u>
  125 F. 3d 79 (2d Cir. 1997).....................................................................................19

<u>National Union Fire Ins. Co. v. Turtur,</u>
  892 F.2d 199 (2d Cir. 1989)...................................................................................17

<u>Norman v. United States,</u>
  942 F.3d 1111 (Fed. Cir. 2019)..............................................................................29

<u>Official Comm. Of Unsecured Creditors of Enron Corp. v. Martin</u>
  <u>(In re Enron Creditors Recovery Corp.),</u>
  376 B.R. 442 – 455 (Banks. S.D.N.Y. 2007)..........................................................31

<u>Safeco Ins. Co. of America v. Burr,</u>
  551 U.S. 47 (2007).................................................................................................19

<u>Sheehy v. New Century Mortg. Corp.,</u>
  690 F. Supp 2d 51 (E.D.N.Y. 2010) .......................................................................17

<u>United States v. Clemons,</u>
  2019 WL 7482218 (M.D. Fl. 10/9/19)...............................................................24, 27

<u>United States v. deForrest,</u>
  2020 U.S. Dist. Lexis 94799 (D. Nev. 5/31/20) .....................................................24

United States v. Flume,
    390 F.3d 847 (S.D. Tex. 2019) ..........................................................................24

United States v. Flume,
    No. 5:16-CV-73, 2018 U.S. Dist. LEXIS 226285 (S.D. Tex. 8/22/2018)...................24, 25, 26

United States v. Horowitz,
    361 F.Supp. 3d 511 (D. Md. 1/18/19) ...................................................................29

United States v. McBride,
    908 F. Supp. 2d (D. Utah 2012) ...................................................................19, 29

United States v. Rem,
    38 F.3d 634 (2d Cir. 1994)...........................................................................18, 19

United States v. Rum,
    2019 U.S. Dist. LEXIS 145931 (M.D. Fla. 2019) .........................................23, 29

Vital v. Interfaith Med. Center,
    168 F.3d 615 (2d Cir. 1999)...........................................................................17

**Statutes**

26 U.S.C. § 1441 ..........................................................................................7

26 U.S.C. §6672 ...................................................................................18, 19

31 USC §5314 ...................................................................................25, 33

31 U.S.C. §5321(a)(5)(c) ..................................................................................33

31 U.S.C. §5321 (b)(2)(A) ..................................................................................1

**Other Authorities**

Fed R. Evid 803(6)...................................................................................31, 32

FRE 803(6)(A) ..........................................................................................31

FRE 902(11) ..........................................................................................31

FRE 902(12) ..........................................................................................32

Rule 56 ...................................................................................23, 24, 26, 30

Defendant, Heinz Gentges ("Heinz"), through his counsel, respectfully submits this Memorandum of Law in Opposition to the Motion for Summary Judgment filed by the Plaintiff in this matter on April 30, 3020.

By prior Order of the Court, the Defendant's response papers are due to be filed with the Court on or before June 30, 2020.

Plaintiff's Reply is due July 15, 2020.

## PRELIMINARY STATEMENT

The Plaintiff alleges this case is simply about a U.S. citizen who set up secret Swiss bank accounts, got caught by IRS and was assessed a $903,853 penalty for his "willful" non-compliance pursuant to 31 U.S.C. §5321 (b)(2)(A) (The 1970 Bank Secrecy Act). That Act requires U.S. citizens to file an annual FBAR (Foreign Bank Account Report) disclosing ownership of foreign accounts to the extent the balance in the account(s) exceeded $10,000 at any point during the year in question. Although it is not disputed that Heinz is a U.S. citizen, had two accounts in Switzerland in 2007 and did not timely file a 2007 FBAR, he did not "willfully" fail to do so.

Heinz is 80 years old. He and his wife, Anna (who is 83), each immigrated to the United States in the early 1960s. They do not have any family in the U.S. but both have large extended families in Europe. They moved back to Austria in June 2017 as they had long planned to do.

Thirteen months later, upon becoming aware of the Complaint filed against him, Heinz did not attempt to hide from the issue and make the government chase him down and try to serve him in Europe. Instead, he authorized his U.S. counsel to accept service for him and filed an Answer denying he willfully failed to file his 2007 FBAR and disputing the $903,853 "willful" penalty assessed against him. He demanded a jury trial.

The Plaintiff's Motion of Summary Judgment claims the facts are undisputed (or indisputable) that Heinz willfully failed to file an FBAR for 2007 disclosing accounts he had held at UBS.  However, as discussed in detail *infra*, the facts are far from undisputed.  Moreover, the inferences to be drawn from even the agreed facts are not indisputable by any means.

It is respectfully submitted that the facts as a whole in no way inevitably and irrefutably lead only to the conclusion that Heinz acted willfully in failing to timely file a 2007 FBAR disclosing his UBS accounts.  There are many facts which suggest the opposite conclusion. Summary judgement cannot resolve these dueling facts and factual inferences; that is the role of the jury as the finder of facts in this case.

For the reasons stated, the government's motion should be denied.

## FACTUAL BACKGROUND

I. **HEINZ PERSONAL HISTORY AND THE OPENING OF TWO SWISS ACCOUNTS**

Heinz was born in Germany in 1939.  His parents were German citizens and residents. He completed high school in Germany (his only formal education).  His father, a tool and die maker, arranged for an apprenticeship for him which he completed and then, to his father's dismay, left Germany in 1959 to begin travelling around Europe.

He stayed for a year in Switzerland where he met Fritz Bosch and the two formed a lifelong relationship.  Bosch had established a small tool & die making business in Lyss and later founded Feintool AG.  Heinz later became the lead tool and die maker at Feintool's U.S. subsidiary, American Feintool.

While working in Switzerland, Heinz established a bank account at Bank Verien in Lyss where he deposited his earnings and saved money to continue his travels. During this period, his mother died leaving him and his sister a share of farmland her family owned in the Aachen area. His mother's siblings began selling portions of the land.  Heinz periodically received his share of the sales proceeds and deposited those monies to the Bank Verien account.

Heinz left Switzerland in the early 1960s to see and work in Sweden and later came to the United States in May 1962 to do the same.  He left his Swiss account open because he intended to return after what he thought were short-term visits abroad.  He never did.  While in New York he met his future wife, Anna, who had just emigrated from Austria.  They married in 1964 and Heinz started a family and established a life as a tool & die maker in New York.  Although he became a U.S. citizen in 1968 he and Anna always wanted to return to Europe someday.

As his mother's family sold more land, Heinz' share continued to be deposited to his Swiss account.  He never used those funds to support himself in the United States or brought the

3

money here because he intended to return eventually and because he wanted to prove to his father that he was capable of supporting himself without help.

At some point Bank Verein was acquired by UBS and Heinz' account became a UBS account. This was the 4549 Account.

In 1989, Heinz' father also died in Germany and Heinz received a smaller sum from his estate with which he established a second account (the 4377 Account) to keep the two inheritances separate. It is unclear if UBS had taken over Bank Verein by this point. However, by 2001, the 4377 Account, like the 4549 Account was a UBS account.

Heinz viewed both the 4549 Account and the 4377 Account as his European heritage and he kept those funds separate from his American assets, intending the funds for his and Anna's retirement and ultimately to pass to Michael who had become a Swiss citizen and had permanently resided there since 1983.

## II.    HEINZ U.S. TAX REPORTING

While working at American Feintool, Heinz met Richard Surico ("Surico") who would serve as his U.S. tax return preparer until 2008. Surico worked as a corporate tax consultant for American Feintool and other corporate clients but also had a small number of individual tax clients.

In the 1970s or 1980s when he and Surico both were physically present at American Feintool, Heinz met in person with Surico. Heinz kept track of Forms 1099, brokerage data and other tax related information (real estate taxes paid, charitable donations, etc.) on handwritten sheets of paper. At tax time, he attached the source documents to the sheets and delivered them to Surico to use in doing his tax return. Surico briefly reviewed the information Heinz gathered and may have asked a few questions but the meetings typically lasted only 15-20 minutes.

4

Surico never had a client who had foreign income, did not do many individual tax returns and never asked Heinz about foreign accounts or income. Because Heinz did not view his European money as having any connection to the U.S. he did not list this information on his summary sheets and never thought to mention his European holdings to Surico.

Heinz retired from American Feintool in 2001; Surico moved to Florida in 2004 but kept his New York practice going by mail. Since at least 2001, the two men did not meet or speak. Their dealings were entirely by mail.

Surico prepared Heinz' return using Computax software. This involved entering the data Heinz provided onto data input sheets which Surico then sent by mail to Computax which generated an actual draft tax return. Computax then sent the draft return (filing, client, and preparer copies) to Surico who would review it briefly for conformity with his input sheet and then send the filing and client copies either by mail to Heinz or to his New York office for pick up by Heinz there. Surico never had a client with a foreign account and it was not his practice to ask clients such a question. Moreover, there was no place on the data input sheets Computax used for any entry to be made by Surico about foreign accounts so he made none. Since no entry was made on the input sheet by Surico, the Computax software defaulted to "No" answers in populating the actual Schedule B for Heinz' return. Neither Heinz nor Surico affirmatively answered the Schedule B questions in any year.

After the return was finished, there was never a post-preparation review meeting between Heinz and Surico. Instead, Heinz either received the completed return in the mail or picked it up from Surico's office. The software generated an instruction sheet and a year to year comparison to the prior year which Heinz also received.

Heinz (a high school educated tradesman) testified that he did not understand how his return was prepared and in reviewing it he did not know what he was looking at beyond the year to year comparison.  That's why he had hired Surico to do his taxes.  He trusted that Surico knew his craft and did not question what he received back was complete.

The 2007 tax year (the year at issue here) was the last year Surico prepared a tax return for Heinz.  Surico, by then living in Florida for several years, may have suggested that Heinz find a local preparer.  However, Heinz evidently did not know any other CPAs or any professionals generally. [1]  A friend ("Unc" Hauber) from his old Queens neighborhood recommended that he file his taxes on Turbo Tax and showed him how to use the Turbo Tax program by doing Heinz' 2008 return for him.

The Turbo Tax Software evidently had prompts about the ownership of foreign accounts because, while preparing Heinz' 2008 return on Turbo Tax, Hauber asked Heinz if he had a foreign account.  Heinz answered the question truthfully and thereafter, Hauber filed a 2008 FBAR for Heinz.  However, Hauber was not an accountant and did not either check the "Yes" box on Schedule B despite filing an FBAR for Heinz nor did he report any of Heinz' Swiss income on the 2008 Turbo Tax filing.  The 2008 FBAR was filed on June 1, 2009, long before Heinz became aware of the IRS investigation of UBS.

To do his 2009 return (in 2010), Heinz decided to master the Turbo Tax software.  He did so with limited success as well.  Although he disclosed having foreign accounts on the 2009 return by answering "Yes" to the Schedule B question and filed a 2009 timely FBAR, he did not report the income generated by his Swiss accounts as he still did not understand the need to report "European" income on a U.S. tax return.  He also answered "Yes" to the second Schedule

_____

[1] Heinz and his wife did form trusts to hold their U.S. assets in 2003 as a probate substitute based on having attended some seminars at a local restaurant conducted by an attorney.  This attorney (Mr. Gordon) was apparently the only other professional he knew or had dealt with in his entire life.

B question about receiving distributions from a foreign trust which was incorrect and a further confirmation that he truly did not understand the forms he was completing.

### III. HEINZ' 2001-2002 SIGNING OF NEW UBS OPENING AND OTHER FORMS RELATING TO THE PRE-EXISTING 4549 ACCOUNT AND THE 4377 ACCOUNT

As noted above, the 4549 Account was established in the early 1960s at what was then Bank Verein in Lyss when Heinz was worked in Switzerland.

In 1989, when his father (also a German citizen and resident) died, Heinz established the 4377 Account to keep that inheritance separate.

At some point prior to 2001 UBS acquired Bank Verein and the two accounts became UBS accounts.

For reasons apparently associated with changes to the United States "QI" or Qualified Intermediary compliance rules taking effect around this time[2] and concerns about possible SEC violations associated with its 2000 acquisition of Paine Webber, in late 2001[3], UBS requested Heinz to sign a stack of new forms for the 4549 Account including "account opening" forms, new Powers of Attorney, and another form dealing with investments in U.S. securities. Exhibit 7 at USA0063-69 and 73-74.

Some of the forms apparently were sent to him in the United States because he signed them in New York on November 12, 2001[4]. However, entries on some of the same forms

---

[2] 26 U.S.C. § 1441 imposed certain withholding obligations on foreign entities relating to income earned abroad from U.S. securities and other U.S. sourced investments by non-U.S. persons. A "qualified intermediary (QI) is generally a foreign bank which signs an agreement with IRS to verify the foreign or U.S. status of the beneficial owners of such income and undertake responsibility for withholding U.S. taxes if necessary. *See also*, J. Song 'The End of Secret Swiss Accounts? The impact of the U.S. Foreign Account Tax Compliance Act (FACTA) on Switzerland's status as a Haven for Offshore Accounts". 35 NW.J. Int'l L & Bus. 687, 695-697 (2015).

[3] Swiss Financial Markets Supervisory Authority (FINMA) Feb. 18, 2009 report "EBK Investigation of the Cross Border Business of UBS, A.G. with its private clients in the USA ("FINMA Report") at 4/17-14/17. Sapinski Decl. Exhibit 6.

[4] Heinz testified that prior to 2000, UBS mailed a number of things, including Bank statements, to him in New York at his home. Gentges Dep. Exhibit 1 at 138:4-24.

suggest they were not fully completed when he signed them and may have been completed by someone from UBS mid-December 2001.  Gentges Decl. at ¶ 15-19.

Similar forms for the 4377 Account were signed in September 2002.

In support of its motion, the Plaintiff places great reliance on alleged "elections" made by Heinz on some of these forms as evidencing his intent to avoid the detection.  Specifically, the Plaintiff claims Heinz elected to have a numbered UBS account, to have his mail held in Switzerland and to avoid U.S. securities investments and did so in order to avoid the IRS from learning of his UBS account.  However, the facts are far from clear regarding what Heinz actually completed and what he understood about the forms he signed.  Moreover, as explained in a report generated by the Swiss financial regulators in February 2009, the new forms appear to be UBS' way of complying with new QI and SEC obligations and were not designed or intended to facilitate tax evasion by its U.S. clients.[5]

The new opening form for the 4549 Account was entitled "Basic Document for Account / Custody Account".  Exhibit 7 at USA0070-71.  On this form Heinz, in his own handwriting, identified himself by his full name and listed his New York address and phone number.  He also inserted "✓" marks to select English and German as his preferred languages.  He left unchecked various other boxes on the form, likely because he did not know what else he needed to fill in.  These were apparently completed later because someone (not Heinz) put "x" in boxes on the Form to select "numbered account" and to "hold mail".  Heinz testified he does not use those "x" marks and always uses "✓" marks.  Although Heinz hand-dated the form "Nov 12, 2001", the form bears a second stamped date "18 Dec. 2001" suggesting this may have been when the other entries were made.  Exhibit 1 at 133:1-137:1.

---

[5] Fimra Report (Exhibit 6) at pp. 9/17-14/17.

Heinz testified he never understood his account to be a "numbered account" as he was not trying to hide his ownership or that he lived in the United States. Although he understood that after 2000 Swiss banks (including Migros Bank later) required mail to be held, he thought it was simply a new requirement of Swiss banking which he did not find unacceptable in his case as he was frequently in Switzerland and it was convenient to pick it up there. Moreover, since he was a buy and hold investor, there was little need for constant monitoring and, from 2001 onward, his son Michael had a Power of Attorney over the account and was doing any day-to-day account monitoring because Heinz was trying to teach him how to manage investments. *Id.* at 138:25-141:18.

UBS also sent and asked him to sign a form entitled "Assets and Income Declaration for US Taxable Persons" although the deadlines referenced in the form had passed a year earlier. The form apparently also arose from UBS' need to comply with the QI Agreement between it and IRS by requiring the holders of U.S. securities to be identified to IRS for withholding tax purposes. According to the form, account holders were provided with three options:

a)     Clients with existing U.S. security holdings could agree to have UBS sell those holdings before the end of 2000 (by November 12, 2001 this date had long passed) and the UBS agreed not to accept any new orders for US security purchases after November 1, 2000 for the client's account; or

b)     Clients without existing investments in U.S. Securities could have their accounts frozen from all new investments in US securities as from 1 November 2000 (again this deadline date expired one year before the form was sent to Heinz) or

c)     Clients who want to continue to invest in US Securities, "could authorize UBS AG to forward Form W-9 completed and signed by me to the U.S. depository. I am aware that my identity will thereby be disclosed to the US Internal Revenue Service."

The signature lines for options a) and c) have lines placed through them which Heinz did not make. Heinz signed next to next to an "x" placed by someone (not him) on the Option b line. By signing he purportedly represented that he had no existing US securities investments and

9

agreed his account would be frozen from new U.S. Securities investments "as from 1 November 2000".

This was not factually correct at the time (November 2001) and never was.  Heinz' Swiss accounts historically had U.S. investments and continued to be heavily invested in U.S. dollar denominated mutual funds issued by, inter alia, JP Morgan Chase, Merrill Lynch and Putnam long after signing this form.  *Id.* at 144:1-145:14 and 147:13-154:3; Exhibit 7 at D002564-79 and Exhibit 8 at D002550-61.

Why Heinz was asked to sign this form and sign where the "x" was placed is unknown.  However what is clear is that his actual account activity was totally inconsistent with the representations on the form.

Moreover, Heinz testified that he was periodically asked by UBS to sign multiple, multi-page forms which he thought were "routine" but did not fully understand.  Exhibit 1 at 147:13-154:3; Gentges Decl. at ¶ 16-17.

## IV.    HEINZ USE OF HIS UBS ACCOUNTS

Heinz testified that he and Anna visited Europe annually from the 1970s onward to see family there and, after Michael moved to Switzerland in 1983 for his apprenticeship at Feintool, went more frequently.  Exhibit 1 at 165:20-166:16; Gentges Decl. at ¶ 8 and 14.  Except to pay for the cost of these trips and the cost of establishing Michael in Switzerland, Heinz did not touch the funds in these accounts.  He also resisted UBS' constant efforts to manage his portfolio for him, preferring to manage his own investments based on his "stomach", i.e. instincts informed by Morningstar and similar publications.  He invested the funds in the Swiss accounts in similar mutual fund and stock investments as he had in the U.S., presumably to make management easier.  Exhibit 1 at 48:5-25, 82:21-84:23 and 126:4-127:12.

He never had a UBS credit or debit card to access the funds in his Swiss accounts and, when he needed money in Europe, he went to a UBS branch, showed his passport and transacted a withdrawal like every other UBS customer.

Starting in 2001, after he retired from American Feintool, Heinz decided to start teaching Michael (who was in Switzerland and about to get married) about investing and granted him a Power of Attorney over both the 4549 and 4377 Accounts to enable him to communicate directly with UBS about the accounts.  Michael described it as a "second apprenticeship" which started out with him simply making appointments for his father to call the bank given the time difference and later progressed to researching stocks and funds by gathering information from UBS about funds of interest.  Eventually this progressed to communicating buy and sell instructions from his home in Lyss to UBS after discussions with Heinz. Exhibit 1 at 73:24-74:20; Exhibit 3 at 43:18-49:17.

During the 2001–2008 period Michael got married to a Swiss woman, purchased an apartment in Lyss and a car and later he and his wife had a child.  During this period Heinz periodically withdrew money for the living expenses he and Anna (who accompanied him on each trip) incurred in Europe and made cash and securities gifts to assist Michael with his growing obligations.  He also made some smaller occasional gifts to family in Germany.  Heinz mainly withdrew funds from the 4549 account (which was significantly larger than the 4377 account) to do this.  These gifts and any local expenses were paid out in Swiss francs or Euros. Exhibit 3 at 23:21-24:9, 39:2-10, 60:2-62:4, 73:24-75:25 and 85:11-86:24.

However, because the majority of the investments in the accounts were U.S. dollar denominated, when funds were needed, and there was not available Swiss Francs or Euros in that currency is in the cash account, a U.S. dollar investment had to mature or be sold or redeemed.

Thereafter, the proceeds were deposited to Heinz' U.S. dollar cash account, withdrawn from there and then converted to local currency.  Exhibit 3 at 100:22-101:12.

The plaintiff attempts to argue without any support that the U.S. dollar withdrawals were really monies Heinz was secretly took back to the U.S. in under $10,000 amounts and argues that most withdrawals were made shortly before Heinz left Switzerland.

Plaintiff conveniently ignores that prior to the subject FBAR penalties being assessed, the IRS examined Heinz' dealings with respect to his and found no evidence that any of the withdrawals came back to the U.S.

Moreover, the Customs and Border Patrol Records of Heinz' exit from Switzerland and re-entry into the U.S. from 2002 to 2010 do not support this contention either.  These records confirm what Heinz said.  The majority of his withdrawals took place soon after arrival in Switzerland or during the trip as shown below.

| Withdrawal Location | Withdrawal Date | Withdrawal Currency | | | Account | | Depart JFK | | Arrive JFK |
|---|---|---|---|---|---|---|---|---|---|
| | | USD | EURO | CHF | | | | | |
| Biel | 7/23/01 | $17,675 | | | 4549 | | Not Avail. | | Not Avail. |
| Biel | 11/20/01 | $7,070 | | | 4549 | | Not Avail. | | Not Avail. |
| Biel | 12/28/01 | $17,170 | | | 4549 | | Not Avail. | | 1/4/02 |
| Zurich | 9/2/02 | $9,595 | | | 4549 | | Not Avail. | | 9/4/02 |
| Zurich | 11/8/02 | $9,045 | | | 4549 | | 11/6/02 | | 11/27/02 |
| Zurich | 8/4/03 | $10,500 | | | 4549 | | 7/27/03 | | 9/8/03 |
| No W/D | -- | -- | -- | -- | | | 11/11/03 | | 11/26/03 |
| Lyss | 8/10/04 | | €4040 | 1000 CHF | 4549 | | 8/6/04 | | 9/18/04 |
| Zurich | 8/30/05 | | €2000 | | 4549 | | 7/30/05 | | 9/10/05 |
| Lyss | 8/11/06 | | | 2000 CHF | 4549 | | 7/14/06 | | 8/19/06 |
| Biel | 11/13/06 | $18,180 | €1019 | | 4549 | | 10/28/06 | | 11/20/06 |
| | 11/13/06 | | | 12000 CHF | 4347 | | 2/24/07 | | 3/25/07 |
| Biel | 6/8/07 | $10,100 | | | 4549 | | 5/8/07 | | 6/17/07 |
| Lyss | 9/26/07 | $8,080 | | 4000 CHF | 4549 | | 8/28/07 | | 10/14/07 |
| Biel | 2/29/08 | $9,595 | | 4000 CHF | 4549 | | 2/23/08 | | 3/22/08 |
| Lyss | 9/19/08 | | | 6000 CHF | 4549 | | 9/16/08 | | 10/12/08 |
| Zurich | 9/25/08 | $73,438 | €5050 | 2300 CHF | 4549 | | | | |

As can be seen from the above analysis, the amount withdrawn varied year to year consistent what was needed at the time.  There are significant amounts withdrawn in 2001-2002

and 2006 – 2008 which Michael identified as periods where he was buying a car and an apartment and was about to become a father.  Only two withdrawals occurred within a week of leaving Switzerland (12/28/01 and 9/2/02) and are as consistent with Heinz making a gift shortly before leaving as with taking funds back.  Exhibit 5.

## V.    CLOSING OF THE UBS ACCOUNTS

In late 2008, UBS ceased doing business with U.S. citizen clients in Switzerland.  UBS informed Heinz that he would have to close his Swiss accounts but what he was told about why he had to do so is disputed.  Heinz testified that he did not know of UBS' problems with IRS, was increasingly unhappy with the service he was getting at UBS and was glad to leave and find another bank to deal with (as he did).  He denies he was told that the reason UBS was requiring him to close his account was the IRS inquiry or that he moved his accounts because he refused to sign a W-9 form.

Heinz suspected that it was a ploy to get him to allow UBS to manage his account (which he had historically resisted).  Moreover, the fact that his representative sent a subordinate to meet him infuriated Heinz and further hardened his resolve to take his business elsewhere.  Exhibit 1 at 195:23-196:5 and 198-1-200:22.

In early October 2008, he moved his accounts to Migros Bank.  In doing so, he made no effort to conceal his U.S. citizenship and freely signed all required documents authorizing Migros Bank to disclose his account to IRS.  Exhibit 11 at USA0851-852.

This was a year before in when he received a letter from the Swiss Federal Tax Authority ("SFTA") and became fully aware of the IRS investigation of UBS and how it impacted him.

13

### VI.   HEINZ VOLUNTARILY DISCLOSED HIS UBS INVOLVEMENT

In May or June 2010, Heinz received a letter from the SFTA.  By this point he had already filed a 2008 FBAR in 2009 disclosing that he had a Swiss account.

Heinz promptly contacted the Swiss law firm identified in the SFTA letter and obtained the name of Robert Schwartz, a New Jersey based U.S. lawyer, which the Swiss firm recommended as someone who could assist him locally.

He engaged Schwartz and, on June 4, 2010, Schwartz formally notified the IRS Criminal Investigation Division (as required by IRS Internal Revenue Manual procedures in effect at the time) that Heinz was a former UBS account holder and that he and his wife wanted to make a voluntary disclosure.  The application was accepted in October 2010.  Exhibit 13 at D000014-30.

As IRS' procedures limited the voluntary disclosure process to Taxpayers not already under scrutiny, it is indisputable that Heinz' disclosure occurred well before IRS was aware of his prior non-compliance—hardly the act of someone who was willfully attempting to avoid disclosure.

In February 2011, IRS announced a new formalized voluntary disclosure program specifically for U.S. taxpayers who wanted to rectify prior noncompliance with respect to foreign accounts or assets.  This was the 2011 Offshore Voluntary Disclosure Initiative (2011 OVDI).  Although Heinz and his wife had submitted their voluntary disclosure application to IRS in June 2010 when IRS had no specific program for Taxpayers seeking to remedy prior foreign reporting noncompliance, the IRS deemed Heinz and Anna to be qualified for the 2011 OVDI and notified them of the requirements in April 2011.  Exhibit 13 at D000054-57.

Thereafter on September 2, 2011, Heinz and Anna, through Schwartz, submitted amended income tax returns and delinquent or corrected FBARs for 2003 through 2010 pursuant

to the 2011 OVDI and remitted the additional income taxes, income tax penalties and interest due.  Exhibit 13 at D000058-60.

One of the requirements of the 2011 OVDI was that all participating Taxpayers pay an additional one-time 25% penalty based on the highest aggregate balance in undisclosed foreign accounts or value of other undisclosed foreign assets during the voluntary disclosure period irrespective of whether their non-compliance was intentional, negligent or even innocent.

Heinz has always contended that his failure to initially report his UBS accounts was the result of an honest misunderstanding about whether "European income and assets" which are not brought into or used in the United States are reportable on U.S. tax filings.  Accordingly, he felt the "one size fits all" 25% penalty amount was excessive and asked Schwartz to advocate for a lesser amount.  Schwartz did so by including the following in the letter dated September 2, 2011 transmitting Heinz and Anna's OVDI submission.

> "Please be further advised that Mr. Genges hereby requests your thoughtful consideration of his case as not suitable for settlement on the basis for a 25% of the highest balance in his "offshore" accounts over the period 2003 – 2010 but rather for settlement for lesser amount.  Mr. Gentges' voluntary disclosure letter to IRS in Manhattan – reveals facts and circumstances that present strong countervailing considerations that form the basis for his request."

Among the factors listed by Schwartz as justifying a reduced penalty in Heinz' case were the following

1. That the funds were solely from inheritances received from family members in Germany;
2. That Heinz did not transfer any U.S. funds to the Swiss accounts;
3. That he timely filed a 2009 FBAR and had retained counsel to assist him in rectifying prior IRS noncompliance "before any legal certainty arose the IRS would obtain his account dossier from the Swiss Federal Tax Administration as a result of treaty negotiations with Switzerland; and
4. Heinz' voluntary disclosure was and is truthful and complete.

Exhibit 13 at D000059-60.

15

Unfortunately, the rules governing the OVDI program made the 25% "offshore account penalty" mandatory absent the Taxpayer "opting out" of the OVDI program and subjecting him/herself to regular audit with no guarantees as to what penalties IRS might assert.

Heinz, through new counsel, formally opted out of the 2011 OVDI on April 1, 2013. Exhibit 13 at D002047-49.

IRS then proceeded to conduct a detailed examination. Heinz, through counsel, fully cooperated in that examination and voluntarily extended the statute of limitations period for IRS to propose an FBAR penalty assessment against him several times between 2013 and 2016 (when the penalty was actually assessed). He also voluntarily submitted to an interview conducted by Revenue Agent Christina Murphy in November 2014 and truthfully answered all her questions without hesitation. He acknowledged his errors but denied he made them intentionally.

These are not the actions of someone seeking to avoid responsibility.

## LEGAL ARGUMENT

### I.   STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure (Fed. R. Civ. P.) 56 provides for summary disposition without trial when the pleadings, depositions and other discovery on file, together with the affidavits supporting the motion show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.

"Material" facts are those that may affect the outcome of the case and a dispute over a fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 US. 242, 248 (1986).

The purpose of summary judgment is to isolate and dispose of factually unsupported claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986).

The moving party bears the burden of showing he or she is entitled to summary judgment.  Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir. 2005).

On a motion for summary judgment, the Court is not to weigh the evidence, resolve credibility issues or resolve conflicting versions of events.  Those matters are for the jury to determine at trial, not for the Court to resolve on summary judgment.  Vital v. Interfaith Med. Center, 168 F.3d 615, 622 (2d Cir. 1999); Sheehy v. New Century Mortg. Corp., 690 F. Supp 2d 51, 73 (E.D.N.Y. 2010).

Summary judgment is not appropriate where material factual matters are in dispute. National Union Fire Ins. Co. v. Turtur, 892 F.2d 199, 203 (2d Cir. 1989); Borden Inc. v. Spoor Behrins Campbell & Young, 828 F. Supp. 216 (S.D.N.Y. 1993).

On summary judgment, the evidence of the non-movant is to be believed and all inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  If, as to an issue on which summary judgment is sought, there is any evidence in the record from which a reasonable

inference could be drawn in favor of the opposing party, summary judgment is improper.  <u>Curry v. City of Syracuse</u>, 316 F.3d 324, 333 (2d Cir. 2003).

The application of these principles is illustrated in <u>United States v. Rem</u>, 38 F.3d 634 (2d Cir. 1994), which involved an IRS attempt to collect a penalty under 26 U.S.C. §6672 imposed on Engine Rem for alleged "willful" failure to collect and remit payroll taxes due from the employees of Princeton Industries, a company run by family members in which he had a 20% ownership.  The District Court granted the government's motion but the Second Circuit reversed because it found that the District Court had impermissibly weighed evidence and resolved the disputed factual questions as to whether Rem knew the taxes in question were not being paid against him.

> "The matter of whether Rem was a responsible person within the meaning of 6672(a) presented a number of fact questions.  Some of the <u>Fiatarullo/Hochstein</u> factors were undeniably present, for it was conceded, for example, that Rem had a 20% ownership interest in the company and was both an officer and a director.  However, since §6672(a) was not meant to ensnare those who have merely a titular designation, Rem's contention that his title as president was spurious, being merely a device to induce commercial or financial organizations to grant the company credit, required a probing of the substance of that title and we conclude that the district court's analysis did not view the evidence in the light most favorable to Rem.
> For example, <u>contrary to the district court's conclusion that Rem's contention that his involvement in credit negotiations was solely because of his parents' poor credit rating was "totally unsupported by the record", there were several witnesses who supported Rem's contention</u>."
>                                           * * * * *
>
> <u>…Instead of drawing available inferences that were favorable to Rem, the ruling appears to have weighed the evidence and drawn inferences against him.  Though a trier of fact may reach the same evaluation, the weighing of the evidence and the assessment of credibility were not appropriate for the determination of a summary judgment motion</u>".

<u>Id.</u> at 644-646 (emphasis added).

In this case, similar to the §6672 penalty context, the United States has the burden of proving that Heinz acted willfully in not timely filing his 2007 FBAR in order to support the "willful" FBAR penalty it seeks to collect in this proceeding.  United States v. McBride, 908 F. Supp. 2d, 1186, 1201-1202 (D. Utah 2012).

While in the civil FBAR penalty context, willfulness includes both knowing and reckless conduct, the relevant inquiry is whether Heinz' failure to file the 2007 FBAR by June 30, 2008 was purposeful instead of inadvertent or innocent.  Safeco Ins. Co. of America v. Burr, 551 U.S. 47, 57 (2007); Lefcourt v. United States, 125 F. 3d 79, 83 (2d Cir. 1997).

As can be seen from the facts set forth in the Preliminary Statement, supra., and as discussed, *infra*, as in Rem, there are significant disputed facts which make summary judgment inappropriate.

## II.    THE DISPUTED MATERIAL FACTS.

In support of its Motion, the United States asserts the following allegedly "undisputed indications of Gentges' willfulness".  As discussed *infra* each of these alleged 'undisputed facts are disputed by other facts elicited in discovery, i.e.

> ### a)   Heinz' alleged submission of a 2007 federal tax return falsely answering "No" to a question on Schedule B asking whether he maintained a bank account in a foreign country in 2007.

Heinz did not answer the Schedule B question either "Yes" or "No".  No one did.  The "No" answer was a computerized default because his preparer did not provide anything on the input sheet from which the software company which generated the physical tax return could answer "Yes".  Heinz used the services of Richard Surico ("Surico") to prepare his 2007 U.S. tax return.  Heinz mailed his tax information to Surico (who lived in Florida) and, after Surico was finished, Heinz received the completed return in back without any discussion.

19

Surico testified he never had a client with a foreign account and never asked Heinz about foreign bank accounts at any point in their relationship and neither he nor Heinz had actually answered the question on Schedule B.  He explained that he used Computax computer software to generate tax returns to his clients and sent Computax data input sheets which he prepared in order for Computax to generate a tax return for each client.  He did not make any entry (affirmative or negative) to the input sheets about the existence of foreign accounts for Heinz because there was not even a space on the input sheet for any entry to be made.  Exhibit 2 at 44:4-46:16, 57:11-58:2, 58:17-60:11 and 65:11-23.

Heinz is a high school graduate educated in Germany.  He is a blue-collar tradesman.  He had never heard of an FBAR form, did not know he was required to file one and did not know there were questions on Schedule B about foreign accounts which were answered "No" because, when he received the completed return in the mail, he did not know what he was looking at and simply trusted that Surico (who he had known for many years) did his work properly.  Exhibit 1 at 85:4-86:19, 87:3-19, 89:1-7 and 109:4-110:20.

> **b) Heinz never revealed the existence of his UBS accounts to the few U.S. professionals he dealt with (including Surico) nor did he seek their advice about the tax consequences of having such accounts.**

The argument starts with the false premise that Heinz knew many such "U.S. professionals" and frequently interacted with them.  In truth, aside from Surico, the only other professional Heinz appears to have known prior to 2010 was a lawyer who conducted seminars about estate planning at a local restaurant who Heinz once used to establish a trust for him in 2003 for estate planning purposes.

Heinz did not inquire because he long believed that, because the monies in his UBS accounts originated in inheritances from his German mother (who died in 1959) and German

father (who died in 1989), the money was "European money" which had nothing to do with his U.S. life.  He scrupulously kept it separate from his U.S. assets intending it for use when he and his wife retired back to Europe (as they did in 2017) or to pass to his son, Michael (living in Switzerland since 1983).  He testified that he never imagined these accounts had anything to do with his U.S. tax reporting and never thought to mention them to Surico without being asked.  Exhibit at 43:1 and 97:1-100:2; Gentges Decl. at ¶ 14-15.

          **c)  Heinz' allegedly chose to have "numbered" UBS accounts rather than regular ones, elected to have UBS hold his mail rather than send it to him in the U.S. and purportedly acknowledged his U.S. tax obligations to report by signing certain bank forms in 2001.**

Heinz testified that he never elected to have a numbered account and never viewed his UBS accounts as "secret" because he had these accounts for many years and always had to identify himself by name and show his U.S. Passport to access the accounts at UBS like any other customer.  His son, Michael testified that he (a Swiss citizen since the early 2000s) had accounts at UBS during this same period and saw no difference in how he or his father accessed the bank.

Heinz further testified that he never made any attempt to hide the fact that he was a U.S. citizen living in New York in his dealings with UBS.  He testified that periodically he was asked by UBS to sign multiple new forms and may not have had a full understanding of what he was signing because he naively believed the forms to be routine and, indeed, the forms electing to have a "numbered account" and to have mail held appeared to have been completed by someone else after he had signed them.  Gentges Decl. at ¶ 16-18; Exhibit 1 at 133:1-137:1, 138:4-139:8, 139:13-141:18 and 147:13-154:3.

          **d)  After Heinz had to close his UBS account in October 2008, he did not repatriate the funds to the U.S. and continued to deal with Swiss banks**

**despite the increasing reluctance of Swiss banks to do business with him as a U.S. citizen.**

Whatever he was told is a disputed fact.  That he closed his UBS accounts and moved them to Migros Bank in Switzerland in October 2008 is not disputed.  He denies he was told he had to do so because of an IRS inquiry.  Indeed, he was unhappy with UBS' service in recent years, resented the UBS constant attempts to get him to let it manage his money and he was happy to leave.  Moreover, Heinz was not required to bring the money he inherited from his German parents here.  He had the right to keep it in Switzerland.  That he did so proved nothing.

The fact that increasing U.S. pressure on Swiss banks later caused Migros Bank and Raiffeisen Bank (where Heinz moved his accounts in 2010 after Migros also told him to close his accounts there) to cease doing business with U.S. customers likewise proves nothing about Heinz's intent.  Indeed, by 2010, when he had to move from Migros Bank to Raiffeisen Bank, Heinz had already truthfully voluntarily disclosed his foreign accounts on his 2008 and 2009 Turbo Tax prepared returns and had formally applied for entry into the IRS voluntary disclosure program and disclosed his UBS accounts there as well.

e) **Heinz' made large unexplained withdrawals in cash from U.S. dollar denominated accounts at UBS which he was secretly bringing into the U.S. in under $10,000 amounts.**

This argument appears to be based only on speculation from government counsel that Heinz would only be using Swiss francs or Euros in Europe and "must have been" withdrawing from U.S. dollar sub accounts so he could bring those funds secretly back to the United States.

IRS did an audit prior to asserting the FBAR penalty against Heinz and found no evidence suggesting any of the UBS money was secretly or otherwise brought into the U.S. Exhibit 4 (Murphy Dep.) at 21:2-19.

Moreover, the bulk of the withdrawals took place in 2001–2002 and again in 2007–2008. These were periods where Heinz was helping his son with buying a car and an apartment (2002) and with the birth of his granddaughter (2007). Since, Heinz' accounts were primarily held in U.S. dollar investments if a U.S. denominated investment was sold, the proceeds were into the U.S. dollar cash account and then had to be converted to either CHF or EUR for local use.

Furthermore, an analysis of the withdrawal dates shows that almost all occurred shortly after Heinz arrived in Switzerland or during the middle of his stay (not as he was leaving). Exhibit 5.

### III.   HEINZ DID NOT WILLFULLY FAIL TO FILE A 2007 FBAR.

The Plaintiff contends that Heinz' willfulness is established as a matter of law and there is no need for a trial under this standard.

The Plaintiff cites <u>Kimble v. United States</u>, 141 F.3d 373 (Ct. Cl. 2018) and <u>United States v. Rum</u>, 2019 U.S. Dist. LEXIS 145931 (M.D. Fla. 2019) as prior willful FBAR cases in which summary judgment has been granted primarily premised on the Taxpayers' failure to read their returns and thus, being aware of their FBAR filing obligations and willing fully ignoring them.

Defendant submits that all these cases have significant factual differences, including instances where (unlike Heinz) the Taxpayer's "story" has changed over time.

Moreover, it is respectfully submitted that those courts erred in granting summary judgment because they essentially decided the disputed issue of willfulness by weighing the evidence and making credibility determinations contrary to Rule 56's admonition that, in deciding a summary judgment motion, the Court should draw all factual inferences in favor of the non-movant.

23

Indeed, the Rule 56 standard has been properly applied in a number of prior willful FBAR penalty cases and, where it has, summary judgment was denied.  See, United States v. Clemons, 2019 WL 7482218 (M.D. Fl. 10/9/19) and most recently, United States v. deForrest, 2020 U.S. Dist. Lexis 94799 (D. Nev. 5/31/20).

The Defendant submits that the proper analysis in ruling on the government's summary judgment motion is that employed by the Court in United States v. Flume, No. 5:16-CV-73, 2018 U.S. Dist. LEXIS 226285 (S.D. Tex. 8/22/2018).

Flume disputed that his failure to comply was willful and claimed he did not become aware of the FBAR filing requirement until his preparer told him in 2010.  He claimed he had told his preparer about his UBS account earlier.  He admitted he did not carefully read his completed returns and thus did not notice that the UBS account was not listed on Schedule B but claimed they were "Greek to me" and he relied on his preparer to prepare a proper return.

Flume's preparer disputed Flume's version of events and the UBS records obtained by IRS suggested Flume only filed FBARs in 2010 because he was aware of a potential IRS inquiry about to begin.

It should be noted that subsequently, the Flume matter was tried on the merits before the same judge who ruled, after hearing all the evidence, that Flume had indeed acted willfully and sustained the imposition of the willful FBAR penalty.  United States v. Flume, 390 F.3d 847 (S.D. Tex. 2019).

However, in ruling on the government's pre-trail motion for summary judgment, the Court properly refused to make that determination, noting that "… when a plaintiff moves for summary judgment, it must establish all the elements of its claim so conclusively that a reasonable fact finder "could not return a verdict for the defendant".  Id. at 7.

The District Court denied the Government's summary judgment motion because

> "Flume's testimony – self-serving though it may be – creates a genuine dispute as to whether Flume knowingly disregarded his FBAR filing obligations.... Further there is a genuine dispute about whether Flume acted recklessly because there is evidence he relied on his return-preparer to ensure he was fulfilling his reporting obligations."

Id. at 3.

The Flume analysis applies equally in this case and, Defendants submit, warrants denial of the Plaintiff's motion here as well.

Moreover, in denying the government's summary judgment motion in Flume, the District Court called into question the Plaintiff's underlying premise in making this argument, i.e. that every Taxpayer is on constructive notice of everything that he/she could have known by reading the return word for word.   It found such "constructive knowledge" theory illogical and unpersuasive for three reasons.

First, it ignores the distinction Congress drew between willful FBAR penalties (maximum penalty of 50% of highest balance) and non-willful ones ($10,000 maximum penalty) in 31 USC §5314.

> "If every taxpayer, merely by signing a tax return is presumed to know of the need to file an FBAR", it is difficult to conceive of how a violation could be non-willful".

Flume at 15.

Second (and especially relevant at the summary judgment stage), the Court would be exceeding its authority if it "presumed" Flume examined his return and knew of his FBAR filing obligations by 2008 merely because he signed under a preprinted jurat.   "It is the fact finder's role, not the Court's on summary judgment" … to make that determination.

Lastly, and most importantly, the Court found the government's "constructive knowledge" theory rested on faulty policy arguments, noting that for civil purposes, "reckless"

conduct would satisfy the willfulness requirement and thus, there was no policy need to treat constructive knowledge as a substitute for actual knowledge". <u>Id</u>. at 16.

## IV.    <u>HEINZ DID NOT ACT RECKLESSLY WHEN HE FAILED TO FILE AN FBAR.</u>

Alternatively, Plaintiff argues that even if Heinz did not intentionally or knowingly fail to file the FBAR, he acted with reckless disregard.   In <u>United States v. Flume</u>, No. 5:16-CV-73, 2018 U.S. Dist. LEXIS 226285, at *24 (S.D. Tex. Aug. 22, 2018), the court held that "recklessness" means conduct posing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" (quoting <u>Safeco Ins. Co. of Am. v. Burr</u>, 551 U.S. 47, 68 (2007)).

The court in <u>Flume</u> disagreed with the Government's "recklessness" arguments and held that "because Flume had a tax-return preparer, it was arguably not reckless for him to not 'bother' reading the FBAR instructions." <u>Id</u>. at *26.   Additionally, the court in <u>Flume</u> was unpersuaded that "Flume actually tried to hide the account" and commented that there is a "genuine dispute." <u>Id</u>.   The Court thus declined to draw the Plaintiff's requested inference when Rule 56 demands otherwise.

Here, there is a genuine dispute about Heinz' recklessness for several reasons.   First, there is substantial evidence that neither Heinz nor Surico were aware of the FBAR form and its filing requirements when the 2007 return was prepared and the 2007 FBAR was due.   Surico did not have a regular CPA practice.   He was a corporate tax consultant who had a small individual tax practice servicing at most 25 – 30 clients at its peak and only 4 by 2007.   He never had a client with a foreign account and never had filed an FBAR for a client and saw no need to ask Heinz or any of the others for that matter.

26

There is also ample evidence also that Heinz fully cooperated with the IRS in disclosing his UBS accounts after he hired an attorney and learned of his prior inadvertent non-compliance. The varying inferences to be drawn from all of these facts are to be drawn by the factfinder instead of the Court on a summary judgment motion.

The defendant calls the Court's attention to <u>United States v. Clemons</u> which involved many facts arguably similar to this case (although less favorable to the Taxpayer).

Clemons was a 50 year old computer programmer.  He graduated college and had a degree in Biology.

He intended to move to Europe and, in 2001, deposited $420,000 from his U.S. business account to UBS in Switzerland.   The funds represented wages and dividends from his wholly-owned business and were properly reported on his 2001 U.S. return.  His UBS account was also a "numbered account" and his mail was held although he claimed he didn't recall asking for either.

In 2003 he moved to Australia for a 2 year work assignment and his earnings (net of Australian taxes) were directly deposited to his UBS account.

In October 2008, UBS told him he had to close his UBS account and he moved it to Dresdner Bank, a German bank with a Zurich office where the funds remained until 2010 when he repatriated them to the United States.

Clemons lived and worked in Germany in 2008 and in Holland in 2009 and 2010 before returning to the United States.  In Germany, he initially had his German salary deposited to Pirmaseus Bank, a local German bank but then closed that account at the end of 2008.  In 2009, he opened a Dutch account at ABN-AMRO bank in Holland which he maintained until 2012.

27

He prepared his own 2008-2010 U.S. tax returns using Turbo Tax. All three years' returns were filed significantly <u>after</u> their due dates and after UBS had told Clemons to close his UBS account and after he had moved the money to Dresdner Bank in Zurich.

On his delinquently-filed self-prepared returns he answered "yes" to Schedule B question about foreign accounts but indicated they were in Germany or the Netherlands depending on the year (no mention was made of Switzerland). He explained that, although the Dresdner Bank office that held the former UBS account funds was in Zurich and was open in all three years, he did not also list "Switzerland" because Dresdner Bank was a German bank. He denied he was trying to hide the fact that he still had a Swiss account although he had answered "no" to the same questions in preparing his 2006 and 2007 returns.

He also apparently did not report the investment income on Schedule B of these returns and claimed to be surprised to find out later that the UBS/Dresdner account (which held over $1 million) was an "investment account" and generated investment income.

He did not file timely FBARs for any of the three years despite the Schedule B instructions referencing FBAR filing right under the Schedule B questions he had answered. He claimed this omission was because Turbo Tax did not prompt him on the need to do so.

In July 2011, IRS (which had received Clemons account records under UBS' deferred prosecution agreement) began an audit. Clemons then filed delinquent FBARs for all three years. IRS, believing Clemons was attempting to skirt its 2011 OVDI program and avoid the mandatory 25% to FBAR penalty that was part of the program, asserted willful FBAR penalties for all years.

As here, the government argued that Clemons, having signed his 2008-2010 returns under penalty of perjury and represented that he had examined them before signing, was charged with

constructive knowledge of FBAR reporting requirements referenced in Schedule B and thus *per se* reckless in not filing timely FBARs citing McBride and Norman v. United States, 942 F.3d 1111 (Fed. Cir. 2019), the same cases relied on by plaintiff here.

The District Court agreed that while a Taxpayer cannot avoid learning of the reporting requirements by not reading before signing his return, Clemons' failure to read his return did not conclusively establish his willfulness in not filing his 2008-2010.

> "However, this is just one factor to consider deciding the issues of willfulness and FBAR penalties."

Id. at p. 7.

The Court also distinguished the prior decisions in Kimble and in United States v. Horowitz, 361 F.Supp. 3d 511 (D. Md. 1/18/19) granting the government summary judgment. It noted that willfulness was established in McBride because the taxpayer had actually admitted to misleading the IRS, lying about key details of his foreign dealings and withholding information.

It distinguished Kimble and Horowitz because, in both cases, the taxpayer had (unlike Clemons) answered "No" to the Schedule B questions and never disclosed their foreign accounts until they went into the IRS voluntary disclosure program (unlike Heinz who filed a 2008 FBAR in year 2009, a year before any IRS contact).

Finally, it distinguished Rum, a case in which another Judge in the same district had two months earlier granted the United States summary judgment in a case involving a willful FBAR penalty asserted against another UBS accountholder. The Clemons Court distinguished Rum because Rum (unlike Clemons) had admitted to having a numbered UBS account and to having elected to have his mail held for the purpose of hiding his assets from his U.S. creditors. It also noted that Rum had given differing versions of his story and, unlike Clemons, answered the Schedule B questions "No".

In denying the government a summary judgment motion on the willfulness issues the Court correctly applied the Rule 56 standard and echoing the Second Circuit's observation in United States v. Rem, stated:

> "In a light most favorable to Clemons, he opened his foreign accounts because of plans to move to Europe and denies he died so to conceal his accounts or avoid paying taxes. The UBS account was opened with funds for which he had already paid United States taxes. Thereafter, the funds deposited into that account from entity were after Australian taxes had been paid. He answered yes to question 7(a)… He identified countries in which the foreign accounts were held. He did not timely file FBAR forms because not prompted to do so by the Turbo Tax software and filed them as soon as he learned of the requirement from the IRS agent. As further evidence of the disputed factual record, although his accounts were numbered in which mail was held by the bank, Clemons testified that he did not direct or request that the account be set up as a numbered account and he was not given an option regarding his mail. <u>Genuine issues of material fact exist as to whether Clemons willfully failed to timely file FBARs for the tax years 2008, 2009 and 2010. This issue remains to be decided by the trier of fact.</u>"

<u>Id.</u> at p 8 (emphasis added).

**V.      PORTIONS OF THE RECORDS UBS PROVIDED TO THE GOVERNMENT
PURSUANT TO ITS DEFERRED PROSECUTION AGREEMENT HAVE NOT
BEEN ESTABLISHED TO BE FOREIGN BUSINESS RECORDS ADMISSIBLE
IN EVIDENCE UNDER FED R. EVID 803(6) AND/OR 902(11)/(12)**

The defendant objects to the admissibility of the Client Profile, Statement of Values and

Contact records relied on the government as part of its support for this motion because UBS had

declined to produce either the source records from which these items are derived or a witness

with knowledge of how they were created and defendant's counsel has been unable to satisfy

himself that these records meet the requirements for admissibility and self-authentication.

Fed. R. Evid. ("FRE") 902(12) provides in a civil case, for the admission as self-

authenticated originals or copies of foreign records that meet the requirements of FRE 902(11).

This, in turn, requires the record to meet the "business records" hearsay exception in FRE

803(6)(A) – (C)).

The proponent of such records must give the adverse party reasonable written notice of

the intent to offer the record and "must make the record and certification available for inspection

– so that the party has a fair opportunity to challenge them".  FRE 902(11).

The certification must be from a person who would qualify to testify as a custodial or

other foundation witness and the opponent must have the opportunity to challenge the adequacy

of the foundation set forth in the certification.  Official Comm. Of Unsecured Creditors of Enron

Corp. v. Martin (In re Enron Creditors Recovery Corp.), 376 B.R. 442, 454 – 455 (Banks.

S.D.N.Y. 2007).

The records in question, unlike the regular UBS Bank statements, account opening and

maintenance documents and copies of contemporaneous correspondence or emails from the

bank's files consist of computer generated pages which UBS' U.S. counsel represents are taken

from screen shots of information on a UBS computer system called CAWB ("Client Advisor

Work Bench"). Requests to see the system or sample screen shots to compare to the disputed computer – generated items were declined and it appears the actual CAWB system may not currently exist.

Moreover, the Supporting Certifications relied on by the Plaintiff (Exhibits B and J) are simply rote recitations of the provisions of FRE 803(6). The Exhibit J Certification is made by Christian Thut who identifies himself as UBS' "Director, Global Litigation Switzerland" and is dated January 7, 2020.

This certification was evidently prepared in response to defendant's counsel previously questioning the original FRE 902(12) Certification of these records by Christoph Kurth, UBS legal counsel, dated December 14, 2009. (Exhibit B at USA0010).

UBS has rejected the defendant counsel's request to speak to either or both individuals to determine whether either of them would qualify to testify as a custodian or foundational witness for the questioned records. Sapinski Decl. at Exhibit 14 and ¶15 - 18.

For the foregoing reasons, the Defendant submits that the Plaintiff has not met the prerequisites for self-authentication of the subject records under FRE 902(12) and the documents are inadmissible as evidence in support of this motion.

## VI.   **TO THE EXTENT IT IS TO BE IMPOSED, THE MAXIMUM WILLFUL FBAR PENALTY APPLICABLE TO THE 4337 ACCOUNT FOR 2007 IS $100,000**

Pursuant to 31 U.S.C. §5321(a)(5)(c), "any person willfully violating or willfully causing any violation of a provision of section 5314" (requiring the filing of an FBAR) is subject to a maximum penalty equal to the greater of (1) $100,000 or (2) "50 percent of the amount determined under subparagraph (D)".

Subparagraph (D)(ii) provides that in the case of "a violation involving a failure to report the existence of an account or any identifying information required to be provided with respect to an account", the subparagraph (c)(i)(II) amount is "the balance in the account at the time of the violation".

Internal Revenue Manual (IRM) §4.26.16.6.5(5) provides that the "violation date" in such case is "June 30th of the year following the calendar year for which the account(s) are being reported", i.e. in this case the year is 2007.

Thus, the 2007 willful FBAR penalty for Account 4337 is the greater of $100,000 or 50% of the account balance on June 30, 2008.

The plaintiff claims the penalty amount is $224,488 but bases its contention on the balance in the account on December 31, 2007, not on June 30, 2008 (the "violation date" provided for it in the statute).

In the absence of plaintiff establishing what the balance in Account 4337 was on June 30, 2008, it is respectfully submitted that the "greater" amount is $100,000.

Thus, to the extent the Court finds that Heinz is liable for a willful FBAR penalty for 2007 with respect to the 4337 Account, the amount of that penalty is limited to $100,000 as there is no evidence supporting a calculation of the alternative amount on section 5321(c)(i)(II) nor

any statutory or other authority supporting the use of the balance on any other date as a substitute.

## **CONCLUSION**

Because a reasonable factfinder could conclude that Heinz neither knowingly nor recklessly disregarded his FBAR obligations, there is a genuine dispute as to his willfulness in failing to file a timely 2007 FBAR reporting his UBS accounts. Accordingly, Defendant respectfully requests that the Court deny granting Plaintiff's motion for summary judgment.

Respectfully Submitted,

Richard J. Sapinski
SILLS CUMMIS & GROSS, P.C.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000

Dated: June 30, 2020