UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                              Plaintiff,

        v.

HEINZ GENTGES,

                              Defendant.

No. 18-CV-7910 (KMK)

OPINION & ORDER

Appearances:

Samuel H. Dolinger, Esq.
U.S. Attorney's Office, SDNY
New York, NY
*Counsel for Plaintiff*

Michael J. Pisko, Esq.
Pillsbury Winthrop Shaw Pittman LLP
New York, NY
*Counsel for Defendant*

Richard Sapinski, Esq.
Sills Cummis & Gross, P.C.
Newark, NJ
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

        The United States of America ("Plaintiff" or the "Government") brings this Action

against Heinz Gentges ("Defendant") to collect civil penalties assessed against Defendant based

on his failure to disclose two foreign bank accounts in violation of the Bank Secrecy Act, 31

U.S.C. §§ 5314 and 5321.  Currently before the Court is the Government's Motion for Summary

Judgment.  (*See* Not. of Mot. (Dkt. No. 29).)  For the reasons discussed below, the Motion is

granted in part and denied in part.

## I.  Background

### A.  Factual History

Unless otherwise noted, the following facts are taken from the Parties' Rule 56.1

Statements and Counterstatements.  (*See* Pl.'s 56.1 Statement in Supp. of Pl.'s Mot. ("Pl.'s

56.1") (Dkt. No. 32); Def.'s Counter 56.1 Statement in Opp'n to Pl.'s 56.1 ("Def.'s Counter

56.1") (Dkt. No. 38).)[1]

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule."  *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same).

Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, the Court will not consider these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, as creating disputes of fact.  *See Baity*, 51 F. Supp. 3d at 418 ("Many of [the] [p]laintiff's purported denials—and a number of his admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by [the] [d]efendants, often speaking past [the] [d]efendants' asserted facts without specifically controverting those same facts."); *id.* ("[A] number of [the] [p]laintiffs' purported denials quibble with [the] [d]efendants' phraseology, but do not address the factual substance asserted by [the] [d]efendants."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's 56.1 statement violated the rule because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically controverting those facts," and "[i]n other instances, . . . neither admits nor denies a particular fact, but instead responds with equivocal statements"); *Goldstick v. The Hartford, Inc.*, No. 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (noting that the plaintiff's 56.1 statement "does not comply with the rule" because "it adds argumentative and often lengthy narrative in almost every case[,] the object of which is to 'spin' the impact of the admissions [the] plaintiff has been compelled to make").

Any party's failure to provide record support for its challenge to another party's factual statement could allow the Court to deem the challenged facts undisputed.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (explaining that the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention); *Baity*, 51 F. Supp. 3d at 418 (collecting cases holding that

### 1.  Defendant's Failure to File an FBAR for Calendar Year 2007

In 2007, Defendant was a U.S. citizen with financial interests in two foreign bank accounts—one ending in -4959 (the "4959 Account"), and another ending in -4337 (the "4337 Account")—at UBS AG ("UBS") in Switzerland.  (Pl.'s 56.1 ¶¶ 1–2.)  During 2007, the balance of both accounts exceeded $10,000.  (*Id.* ¶ 3.)  Under 31 U.S.C. § 5314(a) and supporting regulations, Defendant was therefore required to file Form TD F 90-22.1 ("Report of Foreign Bank and Financial Accounts"), commonly known as the "FBAR," for calendar year 2007.  *See* 31 U.S.C. § 5314(a); 31 C.F.R. §§ 103.24, 103.27, *amended and recodified at* 31 C.F.R. § 1010.350 (2011).  (*See also* Pl.'s 56.1 ¶ 4.)

Defendant failed to do so.  (*Id.*)  Between December 2013 and August 2016, Defendant's representative agreed in writing to extend the period in which the Treasury Secretary could assess a penalty against Defendant based on his failure to file an FBAR for 2007.  (*Id.* ¶ 51.)  On October 7, 2016, the IRS assessed two penalties based on Defendant's allegedly willful failure to comply with the FBAR filing requirements.  (*Id.* ¶ 52.)  One penalty, in the amount of $679,365, was based on the 4959 Account, while the other penalty, for $224,488, was based on the 4337 Account.  (*Id.* ¶ 53.)  The IRS examiner's report set forth the agency's basis for concluding that Defendant had willfully failed to disclose his UBS accounts, as well as its determination of the penalty amounts.  (*Id.* ¶ 54.)

---

"responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." (alteration and quotation marks omitted)).  Therefore, where the Court cites to only one of the Parties' Rule 56.1 Statements or Counterstatements, that fact is materially undisputed unless noted otherwise.

2.  Defendant's Foreign Accounts

a.  The 4959 Account

Although Defendant avers that the 4959 Account was not technically "open[ed]" in 2001, as the Government claims, but had in fact been opened years earlier at a different Swiss bank that was subsequently acquired by UBS, he nevertheless concedes that he "partially filled out a UBS form entitled 'Opening of an Account/Custody Account' relating to [the 4959 Account]" in 2001.  (Def.'s Counter 56.1 ¶¶ 5–6.)  Defendant identified himself as the beneficial owner of the account and listed his address in Hawthorne, New York.  (*Id.* ¶ 7.)  It is undisputed that the 4959 Account at UBS was established as a "numbered" account, as opposed to a "named" account, (*See* Pl.'s 56.1 ¶ 6; Def.'s Counter 56.1 ¶ 6), even though Defendant testified that he did not intend to establish such an account, "and did not think of the 4959 Account as a numbered account," (Def.'s Counter 56.1 ¶ 6).[2]

As part of the documentation provided by UBS, Defendant also signed an instruction to UBS that stated: "I would like to avoid disclosure of my identity to the US Internal Revenue Service under the new tax regulations.  To this end, I declare that I expressly agree that my account shall be frozen for all new investments in US securities as from 1 November 2000." (*See* Pl.'s 56.1 ¶ 8; Def.'s Counter 56.1 ¶¶ 8–9.)  Although Defendant protests that he was

---

[2] A "numbered" account means that a number, instead of a name, identifies the account holder in correspondence.  *See United States v. Horowitz*, 978 F.3d 80, 83 (4th Cir. 2020); *see also Norman v. United States*, 942 F.3d 1111, 1113 (Fed. Cir. 2019) (explaining that a "'numbered account,' . . . unlike a 'named account,' means income and asset statements for the account list only the account number and not [the account holder's] name or address").  Along with "hold mail" service, discussed *infra*, a numbered account is often recognized as a "service[] [that] allow[s] U.S. clients to eliminate the paper trail associated with the undeclared assets and income they h[o]ld [in foreign accounts]."  *Horowitz*, 978 F.3d at 83.  Defendant acknowledged that he was familiar with this practice.  (*See* Decl. of Samuel Dolinger, Esq., in Supp. of Pl.'s Mot. ("Dolinger Decl.") Ex. 4 ("Def.'s Dep."), at 135:4–136:11 (Dkt. Nos. 31, 31-4).)

merely signing his name next to a handwritten "X" that indicated where he should sign, and further asserts "that he did not understand the form to mean that he wanted to conceal his identity from IRS by avoiding US securities investments," he does not dispute having signed the declaration.  (*See* Def.'s Counter 56.1 ¶¶ 8–9.)[3]  The form signed by Defendant also acknowledged that he was "liable to tax in the USA as a US person."  (*See* Pl.'s 56.1 ¶ 9; Def.'s Counter 56.1 ¶¶ 8–9.)  Defendant professes that he understood this language "as confirming that he was a US citizen."  (Def.'s Counter 56.1 ¶¶ 8–9.)

It is also undisputed that Defendant had UBS retain his mail related to the 4959 Account at the bank, for a fee, instead of having it mailed to his address in New York.  (Pl.'s 56.1 ¶ 10; Def.'s Counter 56.1 ¶ 10.)  Although Defendant contends that he did not manually select this option, but rather, "someone else inserted an 'x' in a box he left unchecked," (Def.'s Counter 56.1 ¶ 10), he does not dispute that he retrieved his mail related to the 4959 Account whenever he visited the bank in Switzerland—including during three visits in 2007—and authorized UBS to destroy any mail he did not take with him, (*id.* ¶ 11).  And although Defendant disputes how actively he was involved in managing the 4959 Account, he concedes that he "was involved in

---

[3] The Court pauses to reiterate its observation, *supra* note 1, that where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, the Court will not consider these purported disputes as creating genuine disputes of fact.  *See Baity*, 51 F. Supp. 3d at 418.  For example, in response to the Government's assertion that Defendant instructed UBS not to disclose his identity to the IRS, Defendant interjects multiple argumentative paragraphs seemingly designed to obfuscate or mitigate the admission that he did sign the relevant form.  Defendant concludes by arguing that "the form apparently had no actual purpose or effect," and that because "it was obviously intended to operate before '1 November 2000,' one questions why UBS would want the form signed in November 2001 (a year later) if it was actually to be operative."  (Def.'s Counter 56.1 ¶¶ 8–9.)  Apart from the fact that Defendant misreads the form, which operates to freeze investments in US securities "*as from* 1 November 2000" (emphasis added), Defendant's argumentation is irrelevant and inappropriate in the 56.1 statement.

any buy/sell decisions." (*Id.* ¶ 12.)  Finally, Defendant concedes that UBS often corresponded with him using an address in Switzerland.  (*Id.* ¶ 13.)[4]

In June 2008—the deadline for filing the FBAR for 2007—the balance in the 4959 Account was $1,358,730.01.  (*Id.* ¶ 14.)

### b.  The 4337 Account

Just as he had done several months earlier with respect to the 4959 Account, in February 2002 Defendant signed various documents provided by UBS with respect to the 4337 Account. (*See* Def.'s Counter 56.1 ¶ 15.)  As with the 4959 Account, the 4337 Account was also established as a numbered account.  (*See id.*)  Without substantively disputing this point, Defendant avers that he "was periodically asked to sign many UBS forms and thought of it as 'routine' . . . and did not review what he signed in detail or question what it meant" because "he had dealt with UBS for many years and trusted it was a routine request."  (*Id.*)  Defendant identified himself as the beneficial owner of the 4337 Account and listed his address in Hawthorne, New York.  (*Id.* ¶ 16.)

As part of the documentation he completed regarding the 4337 Account, Defendant stated that he was "liable to tax in the USA as a US person" and agreed that the account would be

---

[4] Defendant has challenged the admissibility of certain records pertaining to the 4959 Account.  (*See* Def.'s [Corrected] Mem. of Law in Opp'n to Pl.'s Mot. ("Def.'s Opp'n") 22–24 (Dkt. No. 42); Decl. of Richard J. Sapinski, Esq., in Opp'n to Pl.'s Mot. ("Sapinski Opp'n Decl.") ¶¶ 15–18 (Dkt. No. 36).)  The records in question, bearing the Bates Stamps USA0018 and USA0040–48, can be found within Exhibit B to the Dolinger Declaration filed in support of Plaintiff's Motion for Summary Judgment.  (*See* Dolinger Decl. Ex. B (Dkt. No. 31-2); *cf.* Sapinski Opp'n Decl. Ex. 14 (Dkt. No. 36-15) (discussing and attaching the challenged records, a subset of which were included by the Government in Exhibit B to the Dolinger Declaration).) Because the Court has not relied on the challenged records in resolving this Motion, it need not reach Defendant's admissibility argument.

"frozen for all new investments in US securities." (*Id.* ¶ 17.)[5]  Again, without disputing that he

made this representation, Defendant avers "that he understood the form to be simply an

acknowledgement of his US citizen status (which he never denied or sought to conceal) although

he admittedly did not read the form carefully because he believed it was just routine paperwork

UBS needed signed." (*Id.*)  As with the 4959 Account, Defendant instructed UBS to hold any

mail pertaining to the 4337 Account at the bank and retrieved the mail while visiting the bank in

Switzerland, including on three occasions in 2007.  (*See id.* ¶¶ 18–19.)  Without substantively

challenging this proposition, Defendant explains that he "had no problem with UBS holding his

mail because . . . he was frequently in Switzerland for extended periods and could easily retrieve

his mail at any UBS branch while there." (*Id.*)[6]  At the end of 2007, the balance for the 4337

Account was $448,975.  (*Id.* ¶ 20.)

### 3.  Defendant's Formation of Trusts

In 2003, Defendant and his wife formed various trusts for estate planning purposes.

(Pl.'s 56.1 ¶ 21; Def.'s Counter 56.1 ¶ 21.)  But although they transferred the ownership of their

New York home and all U.S. accounts into these trusts, Defendant did not transfer his UBS

---

[5] As he has done throughout his Counter 56.1 Statement, Defendant objects to this assertion without offering any substantive basis for the objection.  Here, for example, Defendant contends that "[u]nlike the form relating to [the 4959 Account] signed in November 2001[,] the form for [the 4337 Account] says nothing about disclosing or not disclosing the signer's identity to the IRS." (Def.'s Counter 56.1 ¶ 17.)  Maybe so, but the Government's assertion in ¶ 17 is not to the contrary.  (*See* Pl.'s 56.1 ¶ 17.)

[6] Defendant also explains that "[u]nlike the similar form completed in November 2001 for [the 4959 Account,] which [Defendant] at least partially completed in his own hand, the form for [the 4337 Account] is fully typed except for [Defendant's] signature . . . .  Among the typed entries is an 'x' in the box directing UBS to hold the account – related mail." (Def.'s Counter 56.1 ¶¶ 18–19.)  Defendant does not explain—and the Court is unaware—what significance this distinction might hold, nor is it clear why this would provide a basis to object to the Government's assertion.  (*See id.*)

accounts into these trusts.  (*See* Def.'s Counter 56.1 ¶ 22.)  Moreover, Defendant did not disclose

the existence of the UBS accounts to the attorney he consulted in forming the trusts, nor did he

seek any advice about the UBS accounts from this attorney or anyone else.  (*See id.* ¶¶ 23–24.)

Though Defendant does not dispute these assertions, he maintains that he "intended the trusts

only to address his U.S. assets[,]" and that his "failure to tell the attorney who formed the U.S.

trusts about his UBS accounts is understandable since he felt his UBS accounts could pass to [his

son] without any problem upon his death . . . ."  (*Id.* ¶¶ 22–24.)

### 4.  Defendant's 2007 Income Tax Return

For "decades" before Defendant submitted his 2007 U.S. income tax return, he had used

the same accountant, Richard Surico ("Surico"), to prepare his tax returns.  (Pl.'s 56.1 ¶ 27.)

Defendant does not dispute this point.  (Def.'s Counter 56.1 ¶¶ 26–27.)  He contends, however,

that "[o]ver the entire time Surico did [Defendant's] returns, their contact was minimal[,]" and,

from 2001 onward, Defendant "never had any actual contact with Surico in person or otherwise,"

but would "either drop[] off the tax information he assembled to Surico's New York office,"

which would in turn mail the information to Florida (where Surico moved in 2004), or Defendant

would simply mail the information directly to Surico's Florida address himself.  (*Id.*)

Surico prepared Defendant's tax return for 2007.  (*See id.*)  According to Defendant,

Surico would take the information Defendant provided and input this information into

Computax, a software program, which would in turn "generate[] a draft tax form."  (*Id.*)  Surico

would then review the draft form and mail it to Defendant with instructions on "where to send it,

what to pay, etc. along with a comparison to the prior years."  (*Id.*)  Defendant concedes that he

"had the opportunity to review this tax return after it was prepared" by Surico, (Pl.'s 56.1 ¶ 26),

and that, "for 2007 and other hears [sic], he simply briefly looked at the comparison sheet, and

then signed the return and mailed it without any significant substantive review," (Def.'s Counter 56.1 ¶¶ 26–27).

Defendant also concedes that he never disclosed the existence of his UBS accounts to Surico, and never sought Surico's advice regarding the income he received from those accounts. (*See id.* ¶¶ 28–29.)  Defendant's explanation for this fact is that he "always viewed the money [in those accounts, which] he inherited from his German parents[,] as his 'European heritage[,]' and had scrupulously kept it separate from his U.S. assets," apparently under the belief that this money "had nothing to do with his U.S. tax obligations" and therefore "was [not] relevant to his U.S. tax return preparation."  (*Id.* ¶ 28.)  Defendant also states that Surico "never asked [Defendant] or any of his clients any questions about having foreign accounts or assets in all the years he prepared his taxes," (*id.*), and thus, there was no reason that Defendant "might have [been] alerted . . . to the need to tell [Surico]" about these assets, (*id.* ¶ 29).

It is undisputed that Defendant submitted a U.S. income tax return for the year 2007.  (*Id.* ¶ 25.)  Part III of Schedule B of this return asked Defendant to state whether he had an interest in a foreign financial account in 2007.  (Pl.'s 56.1 ¶ 30.)  Specifically, the instructions for this section stated that a taxpayer "must complete this part if [he] . . . (b) had a foreign account," and required the taxpayer to select "Yes" to question 7(a) if he had an "interest in or a signature or other authority over a financial account in a foreign country."  (*Id.* ¶¶ 32–33.)  If the taxpayer selected "Yes" to this question, Schedule B directed the taxpayer to filing requirements for the FBAR.  (*Id.* ¶ 34.)  Defendant does not dispute that his 2007 return incorrectly responded "No" to question 7(a), thereby indicating that he did not have an interest in any foreign financial accounts.  (*See* Def.'s Counter 56.1 ¶ 35; *see also id.* ¶ 36 (conceding that Defendant later acknowledged this answer was incorrect, because in fact he did have foreign accounts in

Switzerland in 2007).)  According to Defendant, however, neither he nor Surico manually

entered the answer "No."  (*See id.* ¶¶ 30–34.)  What happened, Defendant explains, is that

"Computax software prepared a return for 2007 which automatically defaulted to a 'No' answer

on Schedule B because Surico did not enter anything suggesting the answer was otherwise and

there was no place on the Computax data input sheets for him to make such an entry."  (*Id.*; *see*

*also id.* ¶ 35 ("As Surico never asked [Defendant] about having a foreign account, there was no

data input for that and the Computax program automatically populated a 'No' answer on the tax

return it generated in the absence of anything on the data input sheet suggesting a different

answer.").)  Defendant represents that he "did not even see the 'No' answer in Schedule B during

in [sic] his unguided review of what Surico sent him."  (*Id.* ¶¶ 30–34.)  Instead, "[h]e trusted

Surico knew what he was doing and just signed what he received."  (*Id.*)

### 5.  Defendant's Use of His Foreign Accounts

Between 2001 and 2007, Defendant withdrew approximately $140,000 worth of cash, in

different currencies, from the UBS accounts.  (Pl.'s 56.1 ¶ 37.)  During this same period,

Defendant withdrew $116,560 from U.S. dollar-denominated sub-accounts within the UBS

accounts, including on a number of dates in 2007.  (*Id.* ¶¶ 38–39.)  Similarly, on various dates in

2008, Defendant withdrew approximately $100,000 in cash from these accounts, in different

currencies, including $83,033 from U.S. dollar-denominated sub-accounts.  (*Id.* ¶¶ 40–41.)

Defendant was aware that U.S. regulations required him to declare the transportation of currency

exceeding $10,000 into the United States.  (*Id.* ¶ 42.)  Although Defendant does not dispute these

facts, he denies that he withdrew these amounts in order "to secretly bring them back to the

United States."  (*See* Def.'s Counter 56.1 ¶¶ 37–42.)

6.  Defendant's Relocation of His Foreign Accounts

Sometime around September 2008, Defendant decided to move his Switzerland accounts from UBS to another bank.  (*See* Def.'s Counter 56.1 ¶¶ 43–45.)  Although there is some disagreement as to why he made this decision—the Government contends that UBS told Defendant he had to close his accounts, while Defendant maintains that UBS gave him a choice to close his accounts or agree to let UBS manage his funds in a different type of account, (*see id.* ¶ 43)—it is undisputed that Defendant closed his UBS accounts and transferred them to Migros Bank, another Swiss financial institution, (*see id.* ¶¶ 44–45).  Although Defendant does not challenge the Government's assertion that he never considered moving these accounts into the United States, (*see* Pl.'s 56.1 ¶ 44), he argues that this decision was "hardly surpris[ing]" given his "mindset"—that is, his belief that "his parents [sic] inheritances where [sic] his 'European heritage,'" (*see* Def.'s Counter 56.1 ¶¶ 44–45).  At the time Defendant transferred his funds to Migros Bank, he provided instructions that his retained UBS mail be sent to his son's address in Lyss, Switzerland.  (Pl.'s 56.1 ¶ 46; *see* Def.'s Counter 56.1 ¶ 46.)

Several years after Defendant had transferred his funds to Migros Bank, this bank advised him that he had to close his account there because the bank was "not doing business anymore with American citizen[s]."  (Pl.'s 56.1 ¶ 47 (alteration in original).)  Defendant then transferred his funds to another institution, Raiffeisen Bank, which he chose because it was one of a dwindling number of Swiss banks willing to do business with American customers.  (*Id.* ¶ 48.)  Eventually, Raiffeisen Bank also stopped dealing with American customers, and Defendant transferred his funds to another Swiss bank, Privatbank Von Graffenried, which required fees that were "quite a bit more expensive."  (*Id.* ¶¶ 49–50 (record citation omitted).)

B.  Procedural History

The Government filed its Complaint on August 29, 2018, (*see* Dkt. No. 1), and Defendant answered on January 17, 2019, (*see* Dkt. No. 7).  Following an Initial Pretrial Conference on March 18, 2019, (*see* Dkt. (minute entry for Mar. 18, 2019)), the Parties adopted a Case Management and Scheduling Order, (*see* Dkt. No. 11), which was subsequently revised on July 25, 2019, (*see* Dkt. No. 18), October 2, 2019, (*see* Dkt. No. 20), October 30, 2019, (*see* Dkt. No. 22), and January 15, 2020, (*see* Dkt. No. 24).  The case was referred to Magistrate Judge Paul E. Davison for general pretrial matters, including discovery.  (*See* Order (Dkt. No. 9).)

On March 12, 2020, the Government filed a Pre-Motion Letter seeking leave to file a motion for summary judgment.  (*See* Dkt. No. 25.)  Pursuant to a briefing schedule set by the Court, (*see* Dkt. No. 26), the Government filed the instant Motion and supporting papers on April 30, 2020, (*see* Not. of Mot.; Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (Dkt. No. 30); Dolinger Decl.; Pl.'s 56.1).  After the Court set a revised briefing schedule, (*see* Dkt. No. 34), Defendant filed his opposition papers on June 30, 2020, (*see* Def.'s Mem. of Law in Opp'n to Pl.'s Mot. (Dkt. No. 35); Sapinski Opp'n Decl.; Decl. of Heinz Gentges in Opp'n to Pl.'s Mot. ("Gentges Opp'n Decl.") (Dkt. No. 37); Def.'s Counter 56.1).  Reply papers were filed on July 15, 2020.  (*See* Dkt. No. 39.)  On July 23, 2020, Defendant sought leave to file a revised opposition brief to comply with the Court's 25-page limit for briefs, (*see* Dkt. No. 40), the Court granted the request, (*see* Dkt. No. 41), and Defendant subsequently filed his revised brief on the same day, (*see* Def.'s Opp'n).  On July 28, 2020, the Government requested leave to file an amended reply in response to Defendant's revised opposition brief.  (*See* Dkt. No. 43.)  The Court granted the request, (*see* Dkt. No. 44), and the Government filed its revised reply the same day, (*see* Am. Reply Mem. of Law in Further Supp. of Pl.'s Mot.

("Pl.'s Reply") (Dkt. No. 45)).  On October 27, 2020, the Government filed a letter alerting the Court to supplemental authority from the Fourth Circuit Court of Appeals.  (*See* Dkt. No. 46.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation and quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"To survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents

or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").  And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (citation and quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *Brod*, 653 F.3d at 164 (citation omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  However, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B.  Analysis

Under 31 U.S.C. § 5314(a), part of the Bank Secrecy Act of 1970, the Treasury Secretary "shall require" U.S. residents or citizens "to keep records, file reports, or keep records and file reports," when they "make[] a transaction or maintain[] a relation for any person with a foreign

financial agency."  31 U.S.C. § 5314(a).  During the relevant time period in this case, the

implementing regulation for this statute provided that:

> [e]ach person subject to the jurisdiction of the United States . . . having a financial
> interest in, or signature or other authority over, a bank, securities[,] or other
> financial account in a foreign country shall report such relationship to the
> Commissioner of the Internal Revenue for each year in which such relationship
> exists, and shall provide such information as shall be specified in a reporting form
> prescribed by the Secretary to be filed by such persons.

31 C.F.R. § 103.24, *amended and recodified at* 31 C.F.R. § 1010.350 (2011).  As noted, a

taxpayer subject to this requirement was required to submit Form TD F 90-22.1, the "FBAR,"

(*see* Pl.'s 56.1 ¶ 4), by "June 30 of each calendar year with respect to foreign financial accounts

exceeding $10,000 maintained during the previous calendar year," *see id.* § 103.27(c), *amended*

*and recodified at* 31 C.F.R. § 1010.350 (2011).[7]  Under 31 U.S.C. § 5321, the Treasury

Secretary may impose a civil penalty of up to $10,000 based on a taxpayer's non-willful failure

to comply with the FBAR reporting requirement.  *See* 31 U.S.C. § 5321(a)(5)(B)(i).  If, however,

a person "willfully violat[es], or willfully caus[es] any violation of," this requirement, the

Secretary may impose a maximum penalty of either $100,000 or an amount equal to 50 percent

of the assets in the unreported account, whichever is greater.  *See id.* § 5321(a)(5)(C)(i); *see also*

*United States v. Bernstein*, — F. Supp. 3d —, 2020 WL 5517315, at *4 (E.D.N.Y. Sept. 14,

2020) (discussing the regulatory scheme under 31 U.S.C. § 5314).

Defendant does not dispute that he failed to timely file an FBAR for calendar year 2007,

and therefore violated the reporting requirement under 31 U.S.C. § 5314(a) and its implementing

regulations.  The only questions presented by the Government's Motion are (1) whether

---

[7] "The regulations relating to the FBAR were formerly published at 31 C.F.R. §§ 103.24 and 103.27, but were recodified in a new chapter effective March 1, 2011."  *United States v. Williams*, 489 F. App'x 655, 656 n.1 (4th Cir. 2012) (unpublished decision).

Defendant's violation was *willful*, and (2) whether the IRS appropriately calculated the penalty assessed against Defendant.  The Court will consider each question in turn.

### 1.  Whether Defendant Willfully Failed to File the FBAR

The term "willful" is not defined in the relevant statute or regulations, *see Bernstein*, 2020 WL 5517315, at *4, and the Second Circuit has not yet addressed this standard under the civil penalty provision of the FBAR statute.  However, the Circuit Courts for the Third, Fourth, and Federal Circuits have all considered this standard and are in agreement regarding its meaning.  According to these courts, "willfulness" under § 5321 includes not only knowing violations of the statute, but *reckless* ones as well.  *See Horowitz*, 978 F.3d at 88 ("[W]e conclude that, for the purpose of applying § 5321(a)(5)'s civil penalty, a 'willful violation' of the FBAR reporting requirement includes both knowing and reckless violations, . . . [and] [w]e thus . . . continue to agree with the other courts of appeals that have considered the issue to date . . . ."); *Norman*, 942 F.3d at 1115 ("[W]e hold . . . that willfulness in the context of § 5321(a)(5)(C) includes recklessness."); *Bedrosian v. United States*, 912 F.3d 144, 152 (3d Cir. 2018) (holding that "a defendant has willfully violated 31 U.S.C. § 5314 when he either knowingly or recklessly fails to file [an] FBAR" (alteration and record citation omitted)).

Numerous district courts around the country—including, most recently, the Eastern District of New York—have adopted the same interpretation of this standard.  *See Bernstein*, 2020 WL 5517315, at *5–7 (adopting *Bedrosian*'s treatment of the "willfulness" standard under the civil penalty provision of the FBAR statute); *United States v. Garrity*, 304 F. Supp. 3d 267, 273–74 (D. Conn. 2018) (gathering authority in support of the court's "conclu[sion] that the Government may prove the element of willfulness in [the context of a civil FBAR penalty] with evidence that [the defendant] acted recklessly"); *United States v. Kelley-Hunter*, 281 F. Supp. 3d

121, 124 (D.D.C. 2017) (observing that, for purposes of establishing willfulness in the context of a civil FBAR penalty, "willful blindness or reckless disregard satisfies the required mental state"); *United States v. Katwyk*, No. 17-CV-3314, 2017 WL 6021420, at *4 (C.D. Cal. Oct. 23, 2017) ("A reckless disregard to statutory duty may be sufficient to satisfy willfulness [for purposes of collecting a civil FBAR penalty]."); *United States v. McBride*, 908 F. Supp. 2d 1186, 1204 (D. Utah 2012) (holding, in the context of a civil FBAR penalty, that willfulness "covers not only knowing violations of a standard, but reckless ones as well" (citation and quotation marks omitted)).  Notably, Defendant does not contest this interpretation of the willfulness standard, conceding that "in the civil FBAR penalty context, willfulness includes both knowing and reckless conduct."  (Def.'s Opp'n 13.)

Given this overwhelming weight of authority, the Court now holds that, for purposes of the civil penalties provision in § 5321(a)(5)(C)(i), a willful violation of the FBAR reporting requirement includes both knowing and reckless violations of the statute.  Although "'willfully' is a word of many meanings whose construction is often dependent on the context in which it appears," the Supreme Court has observed that "where willfulness is a statutory condition of civil liability, . . .  it . . . cover[s] not only knowing violations of a standard, but reckless ones as well."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (citation and some quotation marks omitted); *see also Horowitz*, 978 F.3d at 88 (noting *Safeco*'s "clear articulation of the distinct meanings that attach to the term 'willfully' in the civil and criminal contexts"); *Bedrosian*, 912 F.3d at 152 (invoking *Safeco* and observing that "[t]hough 'willfulness' may have many meanings, general consensus among courts is that, in the civil context, the term 'often denotes that which is intentional, or knowing, or voluntary, as distinguished from accidental, and that it is employed to characterize conduct marked by careless disregard whether or not one has the right

so to act" (citation omitted)).  Although the Second Circuit has not addressed the meaning of

"willfulness" in the context of §§ 5314 and 5321 specifically, it has recognized, in an analogous

context, that "an individual's bad purpose or evil motive in failing to collect and pay the taxes

properly plays no part in the civil definition of willfulness." *Lefcourt v. United States*, 125 F.3d

79, 83 (2d Cir. 1997) (citation, alteration, and quotation marks omitted) (distinguishing

"willfulness" in the context of civil versus criminal actions to collect tax penalties); *see also*

*Bernstein*, 2020 WL 5517315, at *6 (relying on *Lefcourt*'s distinction between civil and criminal

definitions of "willfulness" in concluding that willful violations of the FBAR requirement

encompass recklessness).

   "In the civil context, 'recklessness' encompasses an objective standard—specifically, 'the

civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act

in the face of an unjustifiably high risk of harm that is either known or so obvious that it should

be known." *Horowitz*, 978 F.3d at 89 (alteration omitted) (quoting *Farmer v. Brennan*, 511 U.S.

825, 836 (1994)); *see also Bedrosian*, 912 F.3d at 153 (observing same standard).  "The civil law

uses it for the same purpose that the criminal law sometimes uses 'willful blindness,' that is, to

prevent an actor from denying the patently obvious." *Bernstein*, 2020 WL 5517315, at *7 (citing

*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 35 (2d Cir. 2012)).  Thus, "willful blindness or

reckless disregard satisfies the required mental state" for purposes of a willful violation of the

FBAR reporting statute. *Kelly-Hunter*, 281 F. Supp. 3d at 124.  "At the same time," however,

"civil recklessness requires proof of something more than mere negligence: 'It is the high risk of

harm, objectively assessed, that is the essence of recklessness at common law.'" *Horowitz*, 978

F.3d at 89 (alteration omitted) (quoting *Safeco*, 551 U.S. at 69).

Here, the Government argues that "the record includes numerous undisputed indications

of [Defendant's] willfulness," namely:

> (a) his submission of a federal tax return in which he falsely stated that he had no
> foreign accounts in 2007; (b) his failure to consult with his accountant and trust
> adviser concerning disclosure requirements or tax consequences of the UBS
> accounts—or even to reveal the existence of the accounts to them; (c) his
> interactions with UBS, including signing an instruction preventing UBS from
> investing in U.S. securities on his behalf in order to 'avoid disclosure of [his]
> identity to the US Internal Revenue Service,' using a numbered bank account,
> instructing the bank to hold his mail in Switzerland rather than mailing it to him in
> New York, and moving his money sequentially to three other Swiss banks as each
> stopped dealing with U.S.-citizen customers; and (d) his largely unexplained
> withdrawals of more than . . . one hundred thousand dollars in cash from his U.S.
> dollar-denominated UBS accounts.

(Pl.'s Mem. 2.)  The Court will consider these factors only to the extent necessary to determine

whether the Government has established Defendant's liability on summary judgment.

### a.  Defendant's 2007 Income Tax Return

Here, Defendant concedes that his 2007 tax return erroneously stated that he did not have

a financial interest in any foreign bank accounts.  (*See* Def.'s Counter 56.1 ¶ 36.)  But, as noted,

Defendant argues that neither he nor Surico manually made this representation, which was the

result of a quirk in the software used by Surico.  (*See* Def.'s Opp'n 13 (explaining that "[t]he

'No' answer was a computerized default because [Defendant's] preparer did not provide

anything on the input sheet from which the software company generated the physical tax

return").)  This may be true, but there still is no dispute that Defendant received his finalized

2007 tax return from Surico and had an opportunity to review it before signing and submitting it

to the IRS.  As Defendant admits, however, "for 2007 and other hears [sic], he simply briefly

looked at the comparison sheet [provided by Surico], and then signed the return and mailed it
*without any significant substantive review*."  (Def.'s Counter 56.1 ¶¶ 26–27 (emphasis added).)

This admission dooms Defendant's argument on summary judgment.  Under similar
facts, most courts have held that where, as here, a defendant provides false information regarding
foreign bank accounts by failing to review carefully his income tax return, that defendant has
shown reckless disregard toward, and thus has willfully violated, the FBAR reporting obligation.

In *Williams*, for example, although the defendant had signed his tax return and declared
under penalty of perjury that he had reviewed its contents and found them to be "true, accurate,
and complete," he later testified that he had "never paid any attention to any of the written
words" in his return, including Question 7(a).  *See* 489 F. App'x at 659.  The Fourth Circuit
concluded that the defendant had therefore "made a conscious effort to avoid learning about
reporting requirements"—conduct that "constitute[d] willful blindness to the FBAR
requirement."  *See id.* at 659 (citation and quotation marks omitted).  Although *Williams* was an
unpublished decision, the Fourth Circuit explicitly "adhere[d] to [*Williams*'s] interpretation of
§ 5321(a)(5)(C)['s willfulness standard]" eight years later in *Horowitz*, where it concluded that a
defendant's failure to review his tax returns with "care sufficient . . . to discover [his]
misrepresentation of foreign bank accounts, . . . was again an aspect of [his] recklessness."  *See*
978 F.3d at 90 (affirming district court's conclusion, on summary judgment, that the defendants
recklessly disregarded the FBAR filing requirement and were subject to enhanced civil penalties
for a willful violation under § 5321).  Similar facts were presented in *Norman v. United States*,
where the defendant argued that "she could not have willfully violated the FBAR requirement
because she did not read her 2007 tax return."  942 F.3d at 1116.  The Court of Appeals for the
Federal Circuit disagreed, observing that "[t]he fact that [the defendant] did not read her 2007 tax

return supports that she acted recklessly toward the existence of reporting requirements." *Id.* at 1117.

A number of lower courts have taken this same approach.  In *United States v. Rum*, No. 17-CV-826, 2019 WL 3943250 (M.D. Fla. Aug. 2, 2019), for example, the court concluded on a motion for summary judgment that the defendant's "pattern of signing his tax returns without reviewing them, along with falsely answering 'no' to question 7(a)[,] suffices to support a finding of willfulness to report under the FBAR," *id.* at *8, *report and recommendation adopted*, 2019 WL 5188325 (M.D. Fla. Sept. 26, 2019), *appeal docketed*, No. 19-14464 (11th Cir. Nov. 7, 2019).  Likewise, in *Kimble v. United States*, 141 Fed. Cl. 373 (Fed. Cl. 2018), the court held— again on summary judgment—that a taxpayer had "exhibited a 'reckless disregard' of the legal duty . . . to report foreign bank accounts" where she "answered 'No' to Question 7(a) on her 2007 income tax return" without reviewing the return for accuracy, *id.* at 385–86, *appeal docketed*, No. 19-1590 (Fed. Cir. Feb. 26, 2019); *see also McBride*, 908 F. Supp. 2d at 1212–13 (observing that "even if [the defendant] were not charged with knowledge of the contents of a tax return by virtue of having signed it, the fact that [he] signed a federal income tax return without having an understanding as to its contents, while simultaneously engaging in transactions with foreign entities designed to avoid or defer tax, constitutes evidence of either willful blindness or recklessness").  Similarly, a district court in the Third Circuit recently concluded that a defendant who submitted inaccurate information on an FBAR after failing to review the form carefully had willfully violated the FBAR statute "because he recklessly disregarded the risk that his FBAR was inaccurate." *Bedrosian v. United States*, No. 15-CV-5853, 2020 WL 7129303, at *4–5 (E.D. Pa. Dec. 4, 2020) ("*Bedrosian II*") (noting that, "based on Third and Fourth Circuit precedent, claiming to not have reviewed [a] form does not negate recklessness").

Following the weight of authority from appellate and district courts around the country, the Court concludes that Defendant recklessly disregarded the FBAR reporting obligation by failing to carefully review his 2007 income tax return and erroneously representing that he had no financial interest in foreign accounts.  Although Defendant acknowledges that courts have granted summary judgment based "primarily . . . on the Taxpayers' failure to read their returns and thus, . . . [willfully] ignoring [their FBAR filing obligations]," he argues that cases such as *Kimble* and *Rum* erroneously granted summary judgment "because they essentially decided the disputed issue of willfulness by weighing the evidence and making credibility determinations" that should appropriately be resolved at trial.  (Def.'s Opp'n 16.)  Without directly addressing the persuasive appellate authority from the Fourth Circuit (*Williams*) or the Federal Circuit (*Norman*), Defendant urges the Court to follow a handful of district court cases that have gone the other way.  But for the reasons that follow, the Court finds each of these cases factually distinguishable or analytically flawed.

In one such case, *United States v. Clemons*, No. 18-CV-258, 2019 WL 7482218 (M.D. Fla. Oct. 9, 2019), the defendant had "answered yes to question 7(a) on Schedule B" of his 2008, 2009, and 2010 tax returns, and had identified the countries in which his accounts were held.  *See id.* at *8.  He also maintained that the foreign account in question "was opened with money for which he had already paid U.S. taxes," and that he had initially opened the account because he planned to move to Europe.  *Id.* at *7.  His reason for not filing an FBAR was that he was "unaware of [this] obligation . . . because he was not prompted by TurboTax to do so."  *Id.* Under these circumstances, the court concluded that questions of fact precluded summary judgment.  *See id.* at *8.  Although *Clemons* does share some factual similarities with the instant case—for example, the defendant in *Clemons* also testified that he did not recall asking UBS to

give him a "numbered" account, did not instruct UBS to retain his mail, *id.* at *2, and "promptly

filed his FBARs" once an IRS agent "brought [it] to his attention," *id.* at *7—there is a factual

divergence on the most critical issue.  Whereas the taxpayer in *Clemons* reviewed his tax return

and correctly answered the questions in Schedule B, Defendant—by his own admission—

"signed the return and mailed it without any significant substantive review," (Def.'s Counter

56.1 ¶¶ 26–27).  Thus, in *Clemons*, the defendant's failure to file FBARS could reasonably be

attributed to mere negligence: Though he reviewed his tax form and correctly responded

regarding his foreign bank accounts, he evidently overlooked the FBAR filing because TurboTax

did not prompt him to complete one.  *See* 2019 WL 7482218, at *7.  The clear possibility that a

§ 5314 violation was merely negligent should—and, in *Clemons*, did—preclude summary

judgment on the issue of willfulness.  *See Horowitz*, 978 F.3d at 89 (noting that "civil

recklessness requires proof of something more than mere negligence").  Here, by contrast,

Defendant admits to an act—signing a tax return under penalty of perjury without carefully

reviewing its contents—that courts have repeatedly treated as evidence of recklessness or willful

blindness toward the FBAR reporting obligation.  *Clemons*, then, is consistent with the foregoing

authority.

The second case cited by Defendant is *United States v. Flume*, No. 16-CV-73, 2018 WL

4378161 (S.D. Tex. Aug. 22, 2018).  There, as here, the defendant relied on his tax specialist to

prepare his income tax return and then signed the document without carefully reviewing its

contents.  *See id.* at *6.  The court denied summary judgment, concluding there was a "genuine

dispute as to [the defendant's] willfulness in failing to file timely FBARs reporting his UBS

account."  *Id.* at *9.  In reaching this conclusion, the court expressly "decline[d] to follow the

holdings of *Williams* or *McBride*," *id.* at *7, in which courts had charged the defendants with

constructive knowledge of information in the tax returns they had signed, *see Williams*, 489 F.

App'x at 659 (observing that a taxpayer is charged with constructive knowledge of the contents

in a tax return he signs, and concluding that the defendant's signature on such a return was

"prima facie evidence that he knew the contents of the return," and that Question 7(a)'s

directions to consult the instructions for filing an FBAR "put [the defendant] on inquiry notice of

the FBAR requirement"); *McBride*, 908 F. Supp. 2d at 1206 (recognizing the same principle).

The *Flume* court identified three reasons for rejecting the "constructive-knowledge theory," none

of which, in this Court's view, is persuasive.

First, the *Flume* court said this theory "ignores the distinction Congress drew between

willful and non-willful violations of [§] 5314," and that, "[i]f every taxpayer, merely by signing a

tax return, is presumed to know of the need to file an FBAR, it is difficult to conceive of how a

violation could be non[-]willful." *Flume*, 2018 WL 4378161, at *7 (citation and quotation marks

omitted). But although the constructive-knowledge doctrine undoubtedly expands the range of

conduct that may be held to constitute a willful violation, it does not eliminate the distinction

between willful and non-willful violations altogether, as *Flume* suggests. Just a year after

*Flume*, the *Clemons* case presented an example of conduct that could be considered merely

negligent, and therefore non-willful, as discussed *supra*. Indeed, after the court denied summary

judgment in *Clemons*, the jury ultimately found that two of the defendant's FBAR violations

were non-willful. *United States v. Clemons*, No. 18-CV-258, 2020 WL 7407549, at *2 (M.D.

Fla. Apr. 15, 2020). Another example of a non-willful violation is a situation in which "a

taxpayer did not know about, and had no reason to know about, her overseas account." *Norman*,

942 F.3d at 1115 (rejecting the same argument raised by the *Flume* court, and concluding that an

"interpretation of willfulness [that includes recklessness] does not render superfluous the

portions of § 5321 relating to non-willful conduct"). Clearly, then, it is not too "difficult to conceive of how a violation could be non[-]willful." *See Flume*, 2018 WL 4378161, at *7.

Second, the court in *Flume* claimed that it "would be exceeding its summary-judgment authority if it presumed that [the defendant] 'examined' his returns, and thus knew about the FBAR requirements by 2008, merely because he signed the returns under penalties of perjury." *Id.* In light of the defendant's subsequent testimony that he did not know about the FBAR requirements until 2010, the court observed that it "is the factfinder's role, not the [c]ourt's at summary judgment, to decide which of the two sworn statements carries more weight." *Id.* In this Court's view, that was a dodge. Concluding as a matter of law that a defendant had constructive knowledge of a particular requirement in 2008—despite his own, self-serving testimony that he did not learn about this requirement until 2010—does not require a credibility determination by the factfinder. It is well established that a taxpayer who signs his tax return without reading it is nevertheless "charged with constructive knowledge of [its] contents." *Hayman v. Comm'r*, 992 F.2d 1256, 1262 (2d Cir. 1993) (concluding that a defendant who asserts an innocent-spouse defense to tax evasion cannot claim ignorance regarding the contents of the tax returns she signed); *accord Greer v. Comm'r*, 595 F.3d 338, 347 n.4 (6th Cir. 2010) ("A taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents."); *United States v. Doherty*, 233 F.3d 1275, 1282 n.10 (11th Cir. 2000) (observing that a defendant who "signed [a] fraudulent tax form . . . may be charged with knowledge of its contents"); *Park v. Comm'r*, 25 F.3d 1289, 1299 (5th Cir. 1994) ("Although [the appellant] signed the return without reviewing it, by signing the return she undertook responsibility for it which she cannot escape by simply ignoring its contents."). On summary judgment, courts may—and regularly do—impute

constructive knowledge to defendants based on documents those defendants have signed.  *See,
e.g.*, *United States v. Horowitz*, 361 F. Supp. 3d 511, 529 (D. Md. 2019) (concluding on
summary judgment that defendants willfully violated the FBAR reporting requirement because
their signatures on their tax returns were "prima facie evidence that they knew the contents of the
return, including the foreign accounts question and the cross-reference to filing requirements,
which put them on inquiry notice of the FBAR requirements" (citation, alteration, and quotation
marks omitted)), *aff'd*, 978 F.3d 80 (4th Cir. 2020); *Rum*, 2019 WL 3943250, at *8 (concluding
on summary judgment that a defendant willfully violated the FBAR reporting requirement
because, by signing his 2007 tax return, he was "charg[ed] . . . with constructive knowledge of
the FBAR requirement"); *Kimble*, 141 Fed. Cl. at 385–86 (concluding on summary judgment
that a defendant willfully violated the FBAR reporting requirement where he had answered "no"
to Question 7(a) on his 2007 income tax return, and observing that a taxpayer is "put on inquiry
notice of the FBAR requirement when she sign[s] her tax return" (citation omitted)).  There was
no reason to avoid this same determination in *Flume*, despite the court's statement to the
contrary.

Third, the *Flume* court argued that the constructive-knowledge theory "is rooted in faulty
policy arguments."  2018 WL 4378161, at *7.  The government had argued that by disregarding
the constructive-knowledge doctrine, the court would "encourage taxpayers to sign tax returns
without reading them in the hope of avoiding any negative consequences from inaccurate
reporting."  *Id.* (record citation omitted).  The court rejected this argument, noting that "a
taxpayer who tried to escape liability in this way might be found willful on a recklessness
theory[,]" and thus, "there is no policy need to treat constructive knowledge as a substitute for
actual knowledge."  *Id.*  Assuming this conclusion is true, it still suggests the court could have

found the defendant reckless or willfully blind toward his FBAR reporting obligation.  Again, however, the court declined to make this determination.  *See id.* at *8–9.

In explaining why factual questions precluded such a determination, the *Flume* court relied exclusively on *Bedrosian v. United States*, No. 15-CV-5853, 2017 WL 4946433 (E.D. Pa. Sept. 20, 2017) ("*Bedrosian I*"), in which a Pennsylvania district court held, after trial, that the defendant had not willfully violated the FBAR requirement by submitting an inaccurate version of the FBAR itself, which he had failed to closely examine, *see id.* at *6–7.  Invoking *Bedrosian I* for the proposition that "recklessness is a high bar," the *Flume* court reasoned that because the defendant "had a tax-return preparer, it was arguably not reckless for him to . . . [ignore] the FBAR instructions," and that it was "not so obvious that he took an unjustifiably high risk in doing so."  *Flume*, 2018 WL 4378161, at *8–9.

Four months after *Flume* was decided, however, the Third Circuit concluded that *Bedrosian I* had not used the proper standard to evaluate the defendant's conduct.  *See Bedrosian*, 912 F.3d at 153.  The Third Circuit explained, for example, that *Bedrosian I*'s analysis "impl[ied] [that] the ultimate determination of non-willfulness was based on findings related to [the defendant's] subjective motivations and the overall 'egregiousness' of his conduct, which are not required to establish willfulness in this context."  *Id.*  Moreover, the Third Circuit was left with "the impression [that the district court] did not consider whether [the defendant's] conduct satisfies the objective recklessness standard articulated in similar contexts."  *Id.*  The court therefore remanded the case for further consideration.  *See id.*

On remand, the district court concluded that the defendant's "actions were willful because he recklessly disregarded the risk that his FBAR was inaccurate."  *Bedrosian II*, 2020 WL 7129303, at *4.  Relying principally on the Fourth Circuit's decision in *Horowitz*, the district

court observed: "even if the [defendants in *Horowitz*] did not review their taxes, they signed

them and were thus representing their answers to the government under penalty of perjury. [The

defendant] also claims to not have reviewed his FBAR closely, but he like the [defendants in

*Horowitz*] signed the form." *Id.* at *5. The objective recklessness standard, the court concluded,

"suggest[s] that . . . a taxpayer is responsible for errors that would have been apparent had [he]

reviewed such forms and checks closely[,]" and, under Third and Fourth Circuit authority,

"claiming to not have reviewed [a] form does not negate recklessness." *Id.*

Thus, quite apart from *Flume*'s questionable treatment of the constructive-knowledge

doctrine, its exclusive reliance on *Bedrosian I*'s faulty application of the civil recklessness

standard further undermines any persuasive authority this decision might have offered. The

Court therefore declines to follow *Flume*.

Though Defendant relies primarily on *Flume* and *Clemons*, (*see* Def.'s Opp'n 16–21), he

also cites *United States v. de Forrest*, 463 F. Supp. 3d 1150 (D. Nev. 2020), another case in

which the defendant had signed her tax return without carefully reviewing its contents, *see id.* at

1158. (*See* Def.'s Opp'n 16.) The tax return erroneously omitted the defendant's interest in a

foreign bank account, and the defendant failed to file the required FBAR. *See* 463 F. Supp. 3d at

1158. Despite this fact, the court concluded that the "[d]efendant's purported recklessness and

willful blindness [were] grounded in genuinely disputed material facts," and thus declined to

hold as a matter of law that the defendant's FBAR violation was willful. *Id.* at 1160. While the

record in *de Forrest* contained a number of factual disputes, particularly regarding whether and

when the defendant's tax preparer advised her of the FBAR requirement, *see id.* at 1159–60, the

court failed to distinguish—or, for that matter, even address—the considerable case authority

holding that a taxpayer's submission of an erroneous tax return he or she signed is *per se*

evidence of reckless disregard toward the FBAR obligation.  Although the government brought this authority to the court's attention, the court did not discuss the relevant cases or explain why it chose not to follow this line of cases.  *See id.* at 1158.  Instead, the court concluded that "genuine disputes of material fact do exist."  *See id.* at 1159.  In short, this Court is not persuaded that *de Forrest* adequately considered the weight of persuasive authority and is therefore disinclined to follow its lead.

As noted, Defendant recklessly disregarded the FBAR reporting obligation by failing to review his 2007 tax return and inaccurately representing that he had no foreign accounts. Because a "willful violation" of the FBAR statute "includes both knowing and reckless violations," *Horowitz*, 978 F.3d at 88, the Court concludes that Defendant willfully violated the FBAR reporting obligation.  Though the analysis could end here, the Court will also consider several additional factors that support granting summary judgment to the Government.

### b.  Other Indicia of Defendant's Recklessness

Although Defendant "trusted" and had "years of dealing" with the same tax preparer, (Def.'s Counter 56.1 ¶¶ 26–27), he never disclosed the existence of his foreign accounts or sought his tax preparer's advice regarding these accounts, (*id.* ¶¶ 28–29).  Facing similar facts, courts have repeatedly held that such an omission constitutes evidence of recklessness or willful blindness toward the FBAR reporting obligation.  *See United States v. Ott*, 441 F. Supp. 3d 521, 530 (E.D. Mich. 2020) (finding that the defendant's "failure to discuss his foreign investments with his long-time accountant . . . indicate[d] 'a conscious effort to avoid learning about reporting requirements'" (citation omitted)); *Horowitz*, 361 F. Supp. 3d at 529 (finding that the defendants' failure to discuss the tax liabilities on their foreign accounts with "the accountants they [had] entrusted with their taxes for years . . . easily show[ed] 'a conscious effort to avoid

learning about reporting requirements'" (citation omitted)); *United States v. Bohanec*, 263 F. Supp. 3d 881, 890 (C.D. Cal. 2016) (holding that the defendants "were at least reckless, if not willfully blind, in their conduct with respect to their Swiss UBS account and their reporting obligations regarding the account[]" based on the fact that they "never told anyone other than their children of the existence of the UBS account, including the tax preparers [they] hired to help them file tax returns"); *McBride*, 908 F. Supp. 2d at 1212 (concluding that the defendant's "failure to disclose all relevant information [regarding his financial interest in foreign accounts] to [his accountant] [was] evidence of his willfulness, or at least his reckless disregard, of the potential consequences of failing to comply with the FBAR requirements").

To explain why he never discussed his foreign accounts with his tax preparer, Defendant invokes his long-held belief that this money was his "European heritage" and "had no relevance to his U.S. tax reporting."  (Def.'s Counter 56.1 ¶ 29; *see also id.* ¶¶ 28, 47–50.)  But a defendant's subjective belief does not negate a finding of recklessness or willful blindness, particularly where, as here, a defendant could easily have determined whether his belief was accurate by speaking with a longtime tax preparer.  In *Ott*, for example, the defendant—who was "not a tax expert with any financial or legal training in tax accounting"—erroneously believed he did not have to recognize gain on a foreign financial account until it was liquidated, a view that was based on advice he had received from a tax preparer decades earlier.  441 F. Supp. 3d at 530. According to the court, the defendant's "lack of experience in tax accounting suggests that he knew, or should have known, that relying solely on advice he received as a young adult, without consulting his accountant, was reckless conduct in disregard of potential reporting requirements."  *Id.*  "Therefore," the court concluded, "[the defendant's] claim that he relied on his own beliefs as to his legal reporting obligations, without verifying those beliefs with his long-

time tax preparer, supports a finding of recklessness here." *Id.* at 531.  Similarly, in *Horowitz*,

the defendants believed they did not have to pay taxes on their foreign accounts based on

conversations they had held with friends.  361 F. Supp. 3d at 529.  Granting summary judgment

for the government, the court observed that the defendants' "friends' credentials [were] not

before the [c]ourt, nor [was] there any information from which [the court] could assess whether it

was reasonable for [the defendants] to have accepted what their friends told them as legally

correct."  *Id.*  In any event, the defendants' "failure to have the same conversation with the

accountants they entrusted with their taxes for years . . . easily show[ed] 'a conscious effort to

avoid learning about [FBAR] reporting requirements.'"  *Id.* (citation omitted); *see also Horowitz*,

978 F.3d at 89 ("[The defendants] were reckless in failing to discuss the same question with their

accountant at any point over the next 20 years.").

Here, as in *Ott* and *Horowitz*, Defendant tries to defeat a finding of recklessness by

invoking a purportedly honestly held but erroneous belief regarding his foreign accounts.  But

like the defendants in these other cases, Defendant, who possesses no financial or tax expertise

himself, made no effort to consult his longtime tax preparer to determine whether his belief was

correct.  If anything, the case for recklessness is stronger here than in *Ott* or *Horowitz*.  Whereas

the defendants in those cases at least attributed their erroneous beliefs to faulty advice they had

received from others, here, Defendant points only to his own vague notion that the UBS accounts

were his "European heritage," and therefore stood beyond the reach of U.S. tax laws.  (*See* Def.'s

Counter 56.1 ¶ 29.)  In the many years he worked with Surico, Defendant easily could have

verified whether this notion was correct.  His failure to do so suggests "a conscious effort to

avoid learning about [FBAR] reporting requirements[,]" or, at the very least, "reckless conduct in

disregard of potential reporting requirements." *See Ott*, 441 F. Supp. 3d at 530 (citation omitted).

Also significant is the fact that both of Defendant's foreign accounts were set up as numbered accounts with "hold mail" service. (*See* Pl.'s 56.1 ¶¶ 6, 10; Def.'s Counter 56.1 ¶¶ 6, 10, 15, 18–19.) Although he, like one of the defendants in *Horowitz*, essentially "denie[s] [having] fill[ed] in the boxes on the agreement with the bank that elected the use of a numbered account and the hold mail service, he surely became aware of their effect as he thereafter communicated with the bank and received no mail from it." 978 F.3d at 90. "This conduct further evinces more than mere negligence." *Id.*

Finally, as was also true in *Horowitz*, Defendant's "Swiss bank accounts were by no means small or insignificant and thus susceptible to being overlooked by [Defendant]." *Id.* Just as the foreign accounts in *Horowitz* served as the defendants' "nest-egg retirement account," *id.*, Defendant viewed his accounts as his "European heritage" that he hoped to pass on to his son, (*see* Def.'s Counter 56.1 ¶¶ 23–24, 28). Accordingly, Defendant made frequent visits to Switzerland—including three trips in 2007—during which he made withdrawals from the accounts and retrieved his mail from UBS. (*See id.* ¶¶ 11, 18–19, 37–42.) *Cf. Horowitz*, 978 F.3d at 90 (noting that the defendants "tended to [their] next egg, traveling twice to Switzerland specifically to look after it").

Between Defendant's false submission on his 2007 tax return and the additional factors discussed above, the Court finds undisputed evidence to conclude that Defendant recklessly disregarded the FBAR reporting obligation. The factors relied upon by the Court today are the same as those which supported a grant of summary judgment in *Horowitz*. *See* 978 F.3d at 89–90. There, as here, "the record indisputably establishes not only that [Defendant] clearly ought

to have known that [he] [was] failing to satisfy [his] obligation to disclose [his] Swiss accounts, but also that [he] [was] in a position to find out for certain very easily." *Id.* at 90 (citation and quotation marks omitted).  Yet, Defendant "neither made a simply inquiry to [his] accountant nor gave even the minimal effort necessary to render meaningful [his] sworn declaration that [his] tax return[] [was] accurate." *Id.*  Having recklessly failed to file an FBAR for 2007, Defendant is subject to enhanced penalties for a willful violation under § 5321.

### 2.  Whether IRS Appropriately Calculated Defendant's Penalty

As noted, the IRS assessed two penalties against Defendant—one penalty for $679,365 based on the 4959 Account, and another penalty for $224,488 based on the 4337 Account.  (Pl.'s 56.1 ¶¶ 52–53.)  Defendant argues that the IRS improperly calculated the penalty assessed with respect to the 4337 Account.  (Def.'s Counter 56.1 ¶ 53; Def.'s Opp'n 24.)

Under 31 U.S.C. § 5321, the maximum civil penalty assessed against a defendant who willfully violates the FBAR filing requirement "shall be increased" to either (i) $100,000 or (ii) 50 percent of the "balance in the [defendant's foreign] account at the time of the violation[,]" whichever amount is greater.  *See* 31 U.S.C. § 5321(a)(5)(C)(i), (D)(ii).  Under the Internal Revenue Manual, "[t]he date of a violation for failure to timely file an FBAR is the end of the day on June 30th of the year following the calendar year for which the accounts are being reported[,]" and thus, "[t]he balance in the account at the close of June 30th is the amount to use in calculating the filing violation."  IRM 4.26.16.6.5.  Accordingly, to calculate the penalty amount for the 4959 Account, the IRS took 50 percent of the balance in that account as of June 30, 2008.  (Dolinger Decl. Ex. I ("FBAR Penalty Lead Sheet"), at unnumbered 1 (Dkt. No. 31-9).)  However, because the IRS did not have the 4337 Account's balance information as of June 30, 2008, it decided to calculate the penalty based on the account's balance as of December 31,

2007, which was $448,975.  (*See id.*)  The question is whether that was a permissible exercise of agency discretion.

Courts have reviewed IRS penalty calculations for abuse of discretion under the "arbitrary and capricious" standard of the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 706(2)(A); *Jones v. United States*, No. 19-CV-4950, 2020 WL 2803353, at *8 (C.D. Cal. May 11, 2020) (applying the APA's "arbitrary and capricious" standard to review the IRS's penalty assessment for an FBAR violation); *United States v. Schwarzbaum*, — F. Supp. 3d —, 2020 WL 1316232, at *12 (S.D. Fla. Mar. 20, 2020) (same); *Rum*, 2019 WL 3943250, at *9 (same); *United States v. Williams*, No. 09-CV-437, 2014 WL 3746497, at *1 (E.D. Va. June 26, 2014) (same). This standard of review "is narrow and particularly deferential[,]" *Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155, 163 (2d Cir. 2003) (citation and quotation marks omitted), and the reviewing court "may not itself weigh the evidence or substitute its judgment for that of the agency[,]" *Davila v. Lang*, 343 F. Supp. 3d 254, 275 (S.D.N.Y. 2018).  Despite the narrow scope of review, however, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Assoc. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Emphasizing the highly deferential standard of review, the Government has cited two cases in which the reviewing court upheld the IRS's penalty calculation.  (*See* Pl.'s Mem. 23 (citing *Rum*, 2019 WL 3943250, at *9; *Williams*, 2014 WL 3746497, at *1).)  Both, however, are factually distinguishable.  Whereas the instant challenge concerns the IRS's alleged departure from cut-and-dry instructions in its own internal guidelines, the cases cited by the Government involve the agency's substantive exercise of discretion in matters where it is given significant

latitude to enforce federal law.  In *Rum*, the IRS had assessed the statutory maximum penalty based on a defendant's willful FBAR violation.  *See* 2019 WL 3943250, at *9.  Although the Internal Revenue Manual provides that a statutory maximum penalty may be reduced if the taxpayer meets four mitigation factors, the IRS concluded that its proposed civil tax fraud penalty against the defendant precluded mitigation.  *See id.* at *3, *4, *9.  The court thus framed its inquiry as "whether the IRS had a rational basis for assessing the civil fraud penalty[,]" so as to preclude mitigation of the statutory maximum FBAR penalty.  *See id.* at *9.  Examining multiple "badges of fraud" the agency had considered, the court concluded the IRS did have a rational basis for imposing the maximum statutory penalty.  *See id.* at *10–11.  In *Williams*, the question was whether the IRS had abused its discretion by assessing two $100,000 maximum penalties in light of the defendant's willful FBAR violation.  *See* 2014 WL 3746497, at *2.  These penalties, the court observed, "were within the range authorized by Congress in 31 U.S.C. § 5321(a)(5)(C) for willful violations."  *Id.*  Having reviewed the record, the court found "sufficient evidence . . . to demonstrate that the $200,000 penalty was the product of reasoned decision-making and consideration of the appropriate factors[,]" including, for example, "the nature of the violation and the amounts involved[,]" as well as "the cooperation of the taxpayer during the examination[.]"  *Id.* (alterations omitted).

    The more persuasive authority comes from a recent pair of cases in which the IRS was accused of using the wrong data when determining the defendant's penalty.  In *Schwarzbaum*, for example, the IRS calculated the defendant's FBAR penalty using "the highest aggregate balance in each account for each year, [rather than] the balance in the account as of June 30 of each year."  *See* 2020 WL 1316232, at *13.  Having found that "the IRS used the incorrect base amounts to calculate the FBAR penalties[,]" the court concluded that these penalties were

arbitrary and capricious.  *See id.*  In *Jones*, the IRS assessed two penalties against the defendant

for alleged FBAR violations in 2011 and 2012.  *See* 2020 WL 2803353, at *3.  To calculate the

penalties, the IRS started with the defendant's account balance as of June 30, 2013 ($3,043,880),

took 50 percent of that amount ($1,521,940), and then prorated this penalty between 2011

($751,685) and 2012 ($770,255).  *See id.*[8]  If the government had properly calculated the 2011

penalty using the June 30, 2012 account balance ($2,970,499)—which was lower than the

balance a year later—then the 50 percent statutory maximum penalty would have been

$1,485,249.50.  *Id.* at *3.  The government's actual 2011 penalty, however, was half that amount.

*See id.* at *8.  Because "the IRS'[s] penalty was based on inappropriate data that should not have

been considered in assessing the penalty[,]" the court held that the agency's calculation was

"arbitrary and capricious."  *See id.*

      This case falls more closely in the *Jones-Schwarzbaum* line of cases than it does in the

*Rum-Williams* line of cases.  Here, as in *Jones* and *Schwarzbaum*, the IRS failed to use the June

30 account balance when calculating the FBAR penalty for the preceding year, thereby departing

from its own internal guidelines.  "It is a fundamental principle of administrative law[,]"

however, "that an agency is bound to adhere to its own regulations."  *Fuller v. Winter*, 538 F.

Supp. 2d 179, 186 (D.D.C. 2008); *see also Service v. Dulles*, 354 U.S. 363, 388 (1957) (stating

that an agency may not "proceed without regard" to the "substantive and procedural standards" it

has "impose[d] upon [itself]"); *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016) ("[W]here the

rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."

(citation omitted)); *Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997) (observing that

---

[8] The government subsequently conceded that the defendant was not liable for the 2012 FBAR penalty.  *Jones*, 2020 WL 2803353, at *4.

agencies are "bound to follow [their] own regulations"); *Nat. Res. Def. Couns. v. EPA*, 438 F. Supp. 3d 220, 229 (S.D.N.Y. 2020) (same).  The Government argues that the "IRS reasonably relied upon the best information available for the 4337 Account—the December 2007 balance of $448,975—because a June 2008 balance was unavailable."  (Pl.'s Reply 10.)  But in light of the Internal Revenue Manual's clear instruction to use the June 30 account balance, the agency's decision to use the December 2007 balance was an arbitrary expedient.  The Court therefore denies the Government's Motion with respect to the penalty calculation for the 4337 Account, and it will therefore "remand [this issue] to the [IRS] for additional investigation or explanation." *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, [or] if the agency has not considered all relevant factors, . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").  However, the Court grants summary judgment with respect to the penalty calculation for the 4959 Account.

## III.  Conclusion

For the reasons stated above, the Government's Motion is granted in part and denied in part.  The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 29), and remand the case to the IRS for a proper determination of the penalty related to the 4337 Account.

SO ORDERED.

Dated:    March 31, 2021
       White Plains, New York

_____
     KENNETH M. KARAS
    United States District Judge